UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>EX REL RAFI KHATCHIKIAN;<br>STATE OF NEW JERSEY, EX REL<br>RAFI KHATCHIKIAN ("RELATOR")<br><br>Plaintiff<br>v.<br><br>PORT IMPERIAL FERRY CORPORATION;<br>PORT IMPERIAL FERRY CORPORATION<br>d/b/a NY WATERWAY; ARTHUR<br>IMPERATORE, President; ALAN WARREN,<br>Vice President; ABC CORPORATIONS<br>1-10 (same names being fictitious) and<br>JOHN DOES 1-10 (same names being fictitious) | COMPLAINT AND PLAINTIFF'S<br>DEMAND FOR A JURY TRIAL<br><br>Civil Case No.:<br><br><br><br>**DO NOT PLACE IN PRESS BOX**<br>**DO NOT ENTER ON PACER** |

*FALSE CLAIMS ACT COMPLAINT*
*AND DEMAND FOR JURY TRIAL*

*INTRODUCTION*

1. The Relator is the original source of the facts and information hereinafter set forth concerning the activities of the various defendants. The facts averred herein are based upon the direct, independent and personal knowledge, and also upon various documents viewed by or in the possession of the Relator, as well as conversations with present and former employees.

1

2. The Relator files this original petition under seal, on his behalf and on behalf of the United States of America and the State of New Jersey. The Relator brings this action seeking to obtain compensatory, punitive and other damages, restitution, reimbursement and civil penalties under applicable law and other equitable and legal relief against the defendants. .

3. The defendants have systematically violated the "Act to Prevent Pollution from Ships" ("APPS") 33 U.S.C. § 1901 et. seq.; the Federal Water Pollution Prevention and Control Act ("Clean Water Act" or "CWA") 33 U.S.C. 1251 et. seq.; the False Claims Act ("FCA") 31 U.S.C. 3729 et. seq. and the New Jersey False Claims Act ("NJFCA") N.J.S.A. 2A:32C-1 et. seq.

4. It is believed that the defendants routinely a) discharge "sullage (water, human waste and disposables) from aboard ship into the Hudson River, b) improperly dispose of waste oil and filters and c) fail to properly advise of the number and quantity of fuel, sullage and oil "spills".

## *PARTIES*

1. Plaintiff/Relator, Rafi Khatchikian, is a resident of the State of New Jersey, currently residing at 20 Coulter Drive, Old Bridge, New Jersey 08857.

2. Port Imperial Ferry Corporation, Port Imperial Ferry Corporation d/b/a NY Waterways (collectively referred to as "NY Waterways") operate a passenger terminal and repair terminal with the principal office located at 4800 Port Imperial Boulevard, Weehawkin, New Jersey 07086.

3. Arthur Imperatore is listed as the President of "NY Waterways".

4. Alan Warren is listed as Vice President of "NY Waterways".

5. ABC CORPORATIONS 1-10 are fictitious corporations, the true names of which are not currently known but may have participated in the action alleged.

6. JOHN DOES 1-10 are fictitious individuals, the true names of which are not currently known but may have participated in the action alleged.

## JURISDICTION

7. This action arises under the False Claims Act, 31 U.S.C. § 3729 et seq. This court has jurisdiction over the case pursuant to 31 U.S.C. § 3732(a). Additionally, this case arises under the "APPS", 33 U.S.C. § 1901 et. seq. and the "CWA", 33 U.S.C. § 1251 et seq. The "APPS" and the "CWA" would separately provide for proper jurisdiction of this court.

## VENUE

8. Venue is proper in this district pursuant to (a) 31 U.S.C. § 3732(a) as the acts complained of and enumerated herein took place within this district; (b) 20 U.S.C. § 1391(b) and (c) because at all times herein relevant, the defendants could be found, resided and/or transacted business in this district; (c) "APPS" as the complained of acts occurred within the State of New Jersey; and (d) the "CWA" as the complained of acts occurred within the State of New Jersey.

## BACKGROUND

9. The Relator began his employment with New York Waterways on September 23, 2013 as a "fueler".

10. After the Relator successfully completed 90 days of employment, he became part of Local 447, the union representing the workers at New York Waterways.

11. The Relator generally worked a scheduled shift from 6 PM until 2:30 AM. His duties included fueling commuter vessels, checking and pumping sewage from the commuter vessels, refilling fresh water tanks as needed and attending to the repair dock and workplace. The Relator worked at the "work dock". An aerial photo of the

"work dock" is depicted in Exhibit "A" attached hereto. The "terminal" dock is depicted in Exhibit "B" attached hereto.

12. Due to the large volume of work and the number of boats requiring refueling and clean out service, it was usual for the Relator to finish work at 4:30 or 5 AM.

13. From the beginning of his employment, the Relator was directed to dispose of raw sewerage from restrooms aboard the commuter vessels, referred to as "sullage", directly into the Hudson River when either a) the sewerage lines to the land area were frozen, or b) when there was such a large volume of work to be done that the "sullage" could not be transferred to land in a timely fashion as determined by the operators of the defendants.

14. When the Relator initially inquired as to how to effectively discharge of the "sullage" at the beginning of his employment with the defendants, he was instructed to utilize an electric pump which was portable and fitted with the requisite hardware to attach to the on board "sullage" tank. The portable electric pump was utilized so frequently that the defendant actually maintained spare pumps and extra parts for the pumps on site. A photo of the modified electric pump is attached as Exhibit "C". The pump is used so often that one of the managers, Ralph Staiano, has an actual nickname for the pump; he calls it "Mafioso"!

15. There were a number of occasions where the number of commuter vessels which needed service was so high that the Relator was instructed to pump the "sullage" directly into the Hudson River to expedite the availability of the commuter vessel for the next scheduled commuter trip, contracted excursion or overnight dockage.

16. The Relator was also instructed to pump the "sullage" directly into the Hudson River when the sewer lines which connected to the land where frozen due to weather. During warm weather and low-volume times, the "sullage" is pumped from the dock area to the land. It is believed that the "sullage" is discharged into the sewer system operated by the Weehawken Sewerage Authority. The sewerage authority does not meter, tabulate or measure the volume of sewerage from the defendants. As a general rule, most sewerage authorities base "sewerage rates" on the volume of water used by a particular user. The sewerage rate is calculated based upon the water meter measuring the volume of water going IN TO a users facility.

17. The difficulty for the defendants is that the "sullage" freezes in the sewer lines which traverse the dock area going to land as they are directly exposed to the elements. The sewer lines followed the dock and gangway from the vessels to land. The large distance between the dock area for the vessels and land can be gleaned from viewing Exhibit "A".

18. Attached hereto and made a part hereof as Exhibit "D" are photos taken by the Relator showing the direct pumping of "sullage" from the vessel "Garden State" and the vessel "Henry Hudson". The Relator cannot recall the exact date; however, it is believed that the photos were taken in February, 2015 utilizing a cellular phone. It is also believed that this was being done due to the weather conditions and an inability to pump the "sullage" ashore.  When the sewer lines are frozen, <u>ALL</u> "sullage" from <u>ALL</u> vessels is pumped into the Hudson River.

19. Exhibit "C" depicts the company modified electric pump utilized to pump from the onboard "sullage" tanks. The defendant's employees actually created the fitting to attach directly to the solids tank as shown in the photos.

20. Depending on the number of commuters on the vessel and the size of the "sullage" tank, the discharge of "sullage" into the Hudson River would vary between 100 and 300 gallons from one particular vessel. Depending on the weather and whether it was a high volume activity day (for example, viewing the fireworks on 4 July) employees for the defendants could easily pump over 1000 gallons of "sullage" into the Hudson River in a day.

21. On numerous occasions, the Relator and other employees complained to "management" and union representatives on the job regarding what they believed to be an illegal activity, specifically, pumping "sullage" into the Hudson River. The

Relator specifically told union representative Mike Siskas and Juan Negron. Mr. Negron told the Relator, on more than one occasion, that he was aware that it was illegal but if the company "got into trouble", he will lose his job.

22. The Relator specifically complained to Ralph Staiano and two ex-managers "Fred" and "Johnny". On every occasion, he was told to do what he was supposed to do and instructed to do. Further, on occasion, the Relator was told by these individuals that, due to the "expensive contracts" with the city of New York and Goldman Sachs, pumping the "sullage" into the river was required to keep the contracts. Any complaints regarding the onboard restrooms or the cleanliness of the vessel could affect the defendant's contracts.

23. The fact is that this activity of dumping the "sullage" into the Hudson River was considered to be illegal and was discussed amongst the employees on a regular basis.

24. Although not an exhaustive list, the following represent some examples of the personal knowledge of individuals and their interaction:

    a. Ivan Torres, a former employee, complained often to management and the union representatives to no avail. Mr. Torres also spoke directly with the Relator indicating that it was "wrong that they were dumping shit into the river". Mr. Torres has since relocated to Florida and has a number of photos and may also have video of the conduct of the defendants as outlined above.

8

    b. The Relator has observed Vice President Alan Warren witness "sullage" going into the Hudson River when coming to the port captain's office. On one occasion, the Relator observed Warren walk past employees Alan Krupa and Pat Russell during the process of discharging "sullage" from the "stationed" pump into the Hudson River.

    c. Deck hands Paul Muia, Joseph Diaz, Julio Garcia, Leo Atshan; mechanics Daniel Wenzel and Brian Bauer; and Captains George Sullivan and Jerry McClellan have all witnessed the "sullage" being pumped directly into the Hudson River. There are a number of other current and former employees who have witnessed this activity. The Relator has phone numbers and contact information for many of these individuals and the information is contained in the disclosure.

25. The defendants will operate "excursion" boats for special events depending on the time of year. For example, it is expected that over the Fourth of July weekend, when New York City has parades and fireworks, there will be a high level of activity for the defendants. Historically, the July 4th weekend has resulted in the direct pumping of "sullage" into the Hudson River to expedite the cleaning and fueling of the vessels so they can return to take passengers between New York and New Jersey.

26. In addition to sink water and human waste, the "sullage" can contain many other items placed into the sink or toilets aboard the vessel by passengers. One such

example would be tampons. The tampons are mentioned as it was not unusual for a tampon to damage the rubber impeller within the electric pump when "sullage" was being offloaded into the Hudson River. This was such a well-known eventuality that the defendant kept a stock of rubber impellers on-site for repairs. Mechanics Pat Russell and Allan Krupa, employees of the defendants, are personally familiar with the repair of the electric pump and the damage to the rubber impeller.

27. The defendants also failed to follow proper disposal procedures regarding oil, oil filters and fuel filters. Exhibit "E" shows a photo of oil filters in a dumpster believed to be owned by the disposal company Waste Management. The photo was taken on March 14, 2015 by Ivan Torres. Mr. Torres shared the photo with the Relator.

28. On or about July 1, 2015 at approximately 10 PM, the Relator experienced a fuel spill at the workplace. The Relator was fueling two vessels and did not know that a "secondary valve" had been left open on the first vessel allowing the fuel to spill into the Hudson River. Pursuant to the company's instructions, the Relator contacted a manager. The Relator advised the manager that the spill was somewhere between 300 and 350 gallons of fuel which had gone into the Hudson River. Mr. Allen Warren told the Relator that "if anybody asks" about the amount of fuel, he was to indicate that it was between 30 and 60 gallons.

29. The fuel spills were so frequent that the company actually had a procedure to "disperse" the petroleum sheen on the river when the spill occurred. Managers would simply start the engine on the vessel while keeping it tied to the dock. The spinning of propellers while at dock caused the petroleum sheen to disperse.

30. The Relator was terminated on August 17, 2015 after the company indicated it was due to the Relator's failure to "follow procedures" in the refueling of vessels. Interestingly, the termination came shortly after the Relator spoke with Ralph Staiano about the "sullage" dumping and the use of the "Mafioso" pump.

31. The Relator brings this action under the Federal False Claims Act and the New Jersey False Claims Act as the defendant has in the past and continues to receive federal and state grants, payments and loans while certifying their compliance with all applicable laws and statutes.

32. The Relator brings this matter pursuant to the "Act to Prevent Pollution from Ships ("APPS") 33 U.S.C. § 1901 due to the improper discharge of "sullage", waste, refuse, oil, petroleum etc. into the Hudson River, a waterway within 3 miles of the geographic boundary of the United States.

33. The Relator brings this action pursuant to the Federal Water Pollution Prevention and Control Act ("CWA") 33 U.S.C. § 1251 et. seq. based upon the conduct noted above.

34. The Relator does, by the appropriate disclosure to the authorities, outline the information, documentation and the witnesses to the conduct alleged.

## *FIRST COUNT*

## *VIOLATION OF THE FEDERAL FALSE CLAIMS ACT*

1. Relator incorporates by reference all of the preceding paragraphs as if more fully set forth herein.
2. Relator seeks relief against the various defendants pursuant to the False Claims Act, 31 U.S.C. § 3729(a) et seq.
3. As set forth in the preceding paragraphs, the various defendants "knowingly made, used or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government".
4. The United States paid or provided monies to the defendants in the form of grants, loans, payments, subsidies or the like relying on the false claim of the defendants that all statutory provisions are being complied with including, but not limited to, the "APPS" and the "CWA".
5. By reason of these false claims, the United States has sustained damages in an amount to be determined at trial.

12

6. By reason of these false claims, the defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the court for each and every violation.

7. Defendants should be obligated to pay treble damages pursuant to the Act.

## SECOND COUNT

### CONSPIRACY TO VIOLATE THE FEDERAL FALSE CLAIMS ACT

1. Relator incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

2. As set forth in the preceding paragraphs, the defendants have conspired with each other to defraud the United States when they "knowingly made, used or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government".

3. The United States paid or provided monies to the defendants in the form of grants, loans, payments, subsidies or the like relying on the false claim of the defendants that all statutory provisions are being complied with including, but not limited to, the "APPS" and the "CWA".

4. By reason of these false claims, the United States has sustained damages in an amount to be determined at trial.

5. By reason of these false claims, the defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the court for each and every violation.

6. Defendants should be obligated to pay treble damages pursuant to the Act.

### THIRD COUNT

### NEW JERSEY FALSE CLAIMS ACT

1. Relator incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

2. Relator seeks relief against the various defendants pursuant to the New Jersey False Claims Act, specifically, N.J.S.A. 2A:32C-1 et seq.

3. As set forth in the preceding paragraphs, the defendants are liable to the state for treble damages and a civil penalty of not less than and not more than the civil penalty allowed pursuant to the Federal False Claims Act in that they either had possession, custody or control of public property and money used or to be used by the State of New Jersey or knowingly presented or caused to be presented a false or fraudulent claim for payment or approval or violated some other sub-section of N.J.S.A. 2A:32C-3.