*UNITED STATES DISTRICT COURT*
*DISTRICT OF NEW JERSEY*

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW JERSEY *ex rel*. RAFI KHATCHIKIAN and IVAN TORRES,<br><br>                    Plaintiffs/Relators,<br><br>          v.<br><br>PORT IMPERIAL FERRY CORPORATION; PORT IMPERIAL FERRY CORPORATION d/b/a NY WATERWAY; ARTHUR IMPERATORE, President; ALAN WARREN, Vice President; ROMULUS DEVELOPMENT CORP.; BILLYBEY FERRY COMPANY, LLC; WILLIAM WACHTEL; ABC CORPORATIONS 1-10 (same names being fictitious) and JOHN DOES 1-10 (same names being fictitious),<br><br>                    Defendants. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Civil Case No.: 2:16-cv-02388-JLL-JAD<br><br>***SEALED***<br><br>**DO NOT PLACE IN PRESS BOX**<br><br>**DO NOT ENTER ON PACER** |

## I.        INTRODUCTION

1.        Operating a fleet of over 30 ferry vessels carrying up to 30,000 passengers per day, Defendants degraded local waterways through their cost-cutting and profit-enhancing practices of routinely, on a daily basis, discharging hundreds of gallons of raw sewage, oil, fuel, and coolant, as well as batteries, aluminum shavings, and other pollutants into the Hudson River, East River, Upper New York Bay, Lower New York Bay, and Raritan Bay. These bodies of water are treasured natural resources, which provide drinking water intakes, recreation, and support for numerous species of marine life, not wastewater dumpsites or landfills as Defendants treat them.

2.        Photos A & B below were taken by Plaintiffs/Relators and show one of many instances when Defendants used an unauthorized portable pump to illegally discharge hundreds of gallons of raw sewage (i.e., human waste) from a vessel's restroom holding tank.

PHOTO A:

1



PHOTO B:



3.      Based on Plaintiffs/Relators' personal experience and direct observations as former employees of Defendant New York Waterway, Defendants routinely: a) discharge sewage and garbage from aboard ship into the Hudson River, primarily when docked at its two maintenance facilities on the New Jersey side of the river, but also by "running open" when they traverse the Hudson River, East River, Upper New York Bay, Lower New York Bay, and Raritan Bay; b) improperly dispose of waste oil, fuel, coolant, batteries, and aluminum shavings into the Hudson River; c) improperly dispose of used oil filters by concealing them in black plastic bags and throwing them into common garbage dumpsters; and d) fail to properly document and advise government authorities of the time, location, pollutant, and quantity of these discharges.

4.      Defendants' actions violated various environmental laws including, without limitation, the Federal Rivers and Harbors Act of 1899, commonly referred to as the Federal Refuse Act ("FRA"), 33 U.S.C. § 401 *et seq.*; the Federal Water Pollution Prevention and Control Act (a/k/a the Clean Water Act or "CWA"), 33 U.S.C. § 1251 *et seq.*; the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901 *et. seq.*; and the New Jersey Water Pollution Control Act ("NJWPCA"), N.J.S.A. § 58:10A-1 *et seq.*

5.      These strict liability laws include substantial penalties, up to $250,000 per occurrence, and some include damages for the harm caused by the pollution or damages measured as the benefit obtained by the violator, all of which Defendants avoided by failing to comply with the concomitant legal requirements to report discharges of pollutants, and by actively concealing the illegal discharges so as to prevent detection by the public and by government authorities.

6.      Two of those Acts, the CWA and APPS, allow citizens to bring lawsuits to enforce those laws and to compel polluters to pay the applicable penalties and damages. This lawsuit includes such claims.

3

7.      This lawsuit also includes claims under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*; and the New Jersey False Claims Act ("NJFCA"), N.J.S.A. § 2A:32C-1 *et seq.* These laws reach more broadly to impose additional statutory penalties and treble the amount of the penalties and damages Defendants avoided paying in the first place under the FRA, CWA, APPS, and NJWPCA.

8.      The FCA and NJFCA also reach more broadly to impose penalties and treble the amount of government grant funds the Defendants obtained by affirmatively misrepresenting to various government entities that they were in full compliance with all laws, including environmental laws, regulating their business. Ironically, one of the grants was for the purchase of several engines that would reduce vessel air pollution emissions.

9.      On April 28, 2016, Relator Khatchikian filed his original Complaint under seal, on his own behalf and on behalf of the United States of America and the State of New Jersey. Relator Torres is added to this First Amended Complaint because he has provided additional information and evidence in support of Defendants' misconduct.

10.     Both Relators bring this action seeking to obtain compensatory, punitive and other damages, restitution, reimbursement and civil penalties under applicable laws, and other equitable and legal relief against Defendants.

**II.      PARTIES**

11.     Plaintiff/Relator Rafi Khatchikian is a resident of the State of New Jersey, currently residing in Middlesex County, New Jersey. Mr. Khatchikian worked as a fueler at the New York Waterway maintenance docks from September 23, 2013 until August 17, 2015, and not only personally observed the improper discharge of pollutants alleged in this action, but was ordered and instructed by his superiors to engage in illegal pollution discharges.

4

12.     Plaintiff/Relator Ivan Torres is a resident of the State of Florida, currently residing in Volusia County, Florida. During his employment with NYW, from the fall of 2011 until about August 2015, Mr. Torres was a New Jersey resident in Hudson County, New Jersey. Mr. Torres previously worked as mechanic and fueler at the New York Waterway maintenance docks and not only personally observed the improper discharge of pollutants alleged in this action, but was ordered and instructed by his superiors to engage in illegal pollution discharges.

13.     Defendant Port Imperial Ferry Corporation ("PIFC") and Port Imperial Ferry Corporation d/b/a NY Waterway (collectively referred to as "NY Waterway" or "NYW") is a New Jersey corporation with its principal office located at 4800 Avenue at Port Imperial Boulevard, Weehawken, New Jersey 07086. NYW operates a fleet of over thirty passenger ferries, carrying over 30,000 passengers per day. NYW also operates a passenger terminal at 4800 Avenue at Port Imperial Boulevard, Weehawken, New Jersey 07086. About one-half mile south, near the intersection of Pershing Road and Port Imperial Boulevard in Weehawken, New Jersey, NYW also operates a large refueling, maintenance, and repair terminal (comprised of two anchored barges, a lattice of docks, and land-based support facilities). A bit farther south, NYW operates a smaller refueling and light maintenance dock used for the premier vessels used to ferry Goldman Sachs employees. Most of the pollution discharges into the Hudson River occurred at these two maintenance docks.

14.     Defendant Arthur Imperatore Sr. is listed as the founder and President of NY Waterway.

15.     Alan Warren is listed as Vice President of NY Waterway.

16.     Romulus Development Corp. ("Romulus") is a New Jersey corporation owned by Arthur Imperatore, with its principal office located at 4800 Avenue at Port Imperial Boulevard,

Weehawken, New Jersey 07086. Relevant here, Romulus owns "water land" in the Hudson River near the intersection of Pershing Road and Port Imperial Boulevard in Weehawken, New Jersey, upon which Port Imperial Ferry Corporation / NY Waterway have anchored two barges and connected docks which serve as the maintenance facility for the fleet of ferries owned and operated by Defendants NY Waterway and Billybey Ferry Company, LLC. It is at this maintenance facility that most of the pollutant discharges into the Hudson River occurred.

17.    Billybey Ferry Company, LLC ("Billybey") is a New Jersey corporation formed by Defendant William Wachtel in about 2004 for the purpose of taking over the debt payments on approximately sixteen of the ferries in NYW's fleet. In about 2016, NYW was reported to have acquired the assets of Billybey, including eleven commuter ferries, and the rights to operate between Hoboken, New Jersey and Manhattan. As part of the 2016 transaction between Billybey and NYW, Billybey also leased-back the two finest vessels in the fleet, the York and Jersey, which it continues to use as commuter vessels for Goldman Sachs employees and for sightseeing excursions. During all periods of time from 2005 to the present, NYW operated and maintained the ferries in which Billybey had an interest. Dun&Bradstreet currently denotes Billybey as a "partnership subsidiary" of NY Waterway, with its principal office located at 4800 Avenue at Port Imperial Boulevard, Weehawken, New Jersey 07086.

18.    William Wachtel ("Wachtel") was the Chairman, as well as the sole or primary owner, of Defendant Billybey Ferry Company, LLC from its inception in about 2004 through today. Wachtel is also a founding partner of the Wachtel Missry law firm in New York, New York.

19.    ABC Corporations 1-10 are fictitious corporations, the true names of which are not currently known but may have participated in the acts alleged.

20.     John Does 1-10 are fictitious individuals, the true names of whom are not currently known but may have participated in the acts alleged.

### III.     JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction over this action because it presents claims under federal statutes. 28 U.S.C. § 1331. In particular, this action includes causes of action under the FCA, the CWA, and the APPS, all of which separately provide for proper jurisdiction. 31 U.S.C. § 3732(a); 33 U.S.C. § 1365; 33 U.S.C. § 1910.

22.     The Court has original jurisdiction of the State law claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b), because this action is brought under the laws of the State of New Jersey for the recovery of funds paid by the State arising from the same scheme.

23.     The Court has personal jurisdiction over Defendants, and venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants reside in or operate in New Jersey, Defendants transact substantial business within this District, and acts proscribed by the FCA, NJFCA, FRA, CWA, APPS, and the NJWPCA, including a substantial part of the events and omissions giving rise to the claims alleged, occurred in this District.

24.     Relators are aware of no statutorily relevant public disclosure of the allegations or transactions forming the core elements of the Counts against Defendants. Even if such a disclosure had occurred, Relators are the "original source" of the allegations in this First Amended Complaint as that term is used in the FCA, 31 U.S.C. § 3730(e)(4)(B), and the NJFCA, N.J.S.A. § 2A:32C-9(c). During their employment and independent investigation, Relators acquired material, direct, independent, and non-public knowledge of the information on which the allegations in this First Amended Complaint are based, and they voluntarily and in good faith provided this information to the United States Government and the State of New Jersey before filing this action.

### IV.   STANDING

7

### A. False Claims Acts

25.     This action includes causes of action under the FCA and NJFCA, where Congress and the New Jersey legislature, respectively, conferred standing upon any person with information about fraud against the government to bring suit on the government's behalf. 31 U.S.C. § 3730(b); N.J.S.A. § 2A:32C-5(b). Under the FCA and NJFCA, Messrs. Khatchikian and Torres are denoted as "Relators."

### B. Environmental Laws

26.     This action also includes "citizen suit" causes of action under the CWA and APPS. Under those laws, Messrs. Khatchikian and Torres are denoted as "Plaintiffs," and have standing to enforce those laws because, as alleged below, they have suffered an actual or threatened injury (i.e., a personal "interest which is or may be adversely affected") as a result of Defendants' misconduct, which injury can be fairly traced to Defendants' misconduct, and it is likely to be redressed by a favorable decision. 33 U.S.C. § 1365 (CWA); 33 U.S.C. § 1910 (APPS); *see Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 70-73 (D.N.J. 1990).

27.     Mr. Khatchikian has suffered an injury in fact because he lives near the Hudson River and enjoys being on and near the water. If NYW had not discharged pollutants into the Hudson River, Mr. Khatchikian would have loved to have gone fishing, crabbing, boating, and jet skiing because he's been an avid recreational boater his entire life. He also has three children and does not take them anywhere near the Hudson River for any type of water activities due to NYW's discharge of pollutants into the river. Mr. Khatchikian has also wanted to take his wife for walks along the Weehawken waterfront after having dinner on the waterfront, but because it disgusts him to know what NYW dumps into the Hudson River, those plans will never happen.

28.     While working at the NYW maintenance docks, Mr. Khatchikian was also forced to be in close contact with raw sewage and its attendant risk of being infected with hepatitis, e-coli, staph, and dozens of other pathogens. Mr. Khatchikian was frequently sick while working at the NYW maintenance docks, as were other employees who were in close contact with the raw sewage discharges.

29.     Mr. Torres has also suffered an injury in fact because he lived near the Hudson River and enjoys being on and near the water. When he lived in New Jersey, Mr. Torres not only chose to work around vessels, but also enjoyed recreational activities on or near the water, such as walking, biking, kayaking, and fishing. After observing and being made aware of the Defendants' practices of discharging human waste, oil, fuel, coolant, and other refuse and pollutants into the local waterways, however, Mr. Torres reduced or completely avoided engaging in recreational activities on or near the affected waters, especially in close proximity to the NYW maintenance docks.

30.     While working at the NYW maintenance docks, Mr. Torres was also forced to be in close contact with raw sewage and its attendant risk of being infected with hepatitis, e-coli, staph, and dozens of other pathogens. Mr. Torres was frequently sick while working at the NYW maintenance docks, as were other employees who were in close contact with the raw sewage discharges. Mr. Torres was also depressed while working at the NYW maintenance docks because he was troubled by seeing and being forced to participate in Defendants' practices of regularly dumping raw sewage, oil, fuel, coolant, batteries, aluminum shavings, and other pollutants into the local waterways. Mr. Torres' depression during this period of time adversely affected his relationship with his spouse and children.

31.     The injuries Messrs. Khatchikian and Torres suffered are fairly traceable to Defendants' acts of discharging raw sewage, oil, gasoline, and other pollutants into the Hudson River and other local waterways. Indeed, Messrs. Khatchikian and Torres personally witnessed, and as employees of NYW were forced to participate in, some of the illegal discharge acts complained of in this lawsuit.

32.     The injuries Messrs. Khatchikian and Torres suffered are likely to be redressed by a favorable decision in this lawsuit, because an injunction will stop future discharges of pollutants by Defendants. In addition, the general public interest in clean waterways will be advanced by an award of civil penalties, which will deter Defendants and other vessel and marina operators from illegally discharging pollutants into local waterways.

**C.  New Jersey Civil RICO**

33.     The New Jersey legislature authorized any person to bring a civil lawsuit if they have been "damaged in their business or property" by a violation of the New Jersey racketeering law. N.J.S.A. 2C:41-4(b).

34.     Here, Mr. Khatchikian alleges that his employment with NYW was terminated after he complained about Defendants' unwritten policy and overt practice of routinely discharging raw sewage, oil, fuel, coolant, and other pollutants into the Hudson River and other local waterways. As a NYW employee, Mr. Khatchikian was also required to participate in Defendants' illegal discharging of pollutants, and he was expected to individually take the blame if any discharge was ever detected.

35.     As previously noted, while working at the NYW maintenance docks, Mr. Khatchikian was also forced to be in close contact with raw sewage and its attendant risk of being infected with hepatitis, e-coli, staph, and dozens of other pathogens. Mr. Khatchikian was

frequently sick while working at the NYW maintenance docks as a result of his exposure to the raw sewage.

36.     As a result of the foregoing, Mr. Torres has suffered emotional distress and direct economic losses, including additional healthcare expenses.

37.     Similarly, Mr. Torres alleges that he was compelled to terminate his employment with NYW after complaining about Defendants' unwritten policy and overt practice of routinely discharging raw sewage, oil, fuel, coolant, batteries, aluminum shavings, and other pollutants into the Hudson River and other local waterways. As a NYW employee, Mr. Torres was also required to participate in Defendants' illegal discharging of pollutants, and he was expected to individually take the blame if any discharge was ever detected.

38.     As previously noted, while working at the NYW maintenance docks, Mr. Torres was also forced to be in close contact with raw sewage and its attendant risk of being infected with hepatitis, e-coli, staph, and dozens of other pathogens. Mr. Torres was frequently stressed and physically sick while working at the NYW maintenance docks, due to being in close contact with raw sewage and being forced to participate in the illegal conduct.

39.     Mr. Torres was also depressed while working at the NYW maintenance docks because he was troubled by seeing and being forced to participate in Defendants' practices of regularly dumping raw sewage, oil, fuel, coolant, batteries, aluminum shavings, and other pollutants into the local waterways. Mr. Torres' depression during this period of time adversely affected his relationship with his spouse and children.

40.     As a result of the foregoing, Mr. Torres has suffered emotional distress and direct economic losses, including additional healthcare expenses.

## V.   STATUTORY AND REGULATORY CONTEXT

### A.  The Federal and New Jersey False Claims Acts

41.     The federal FCA is "the Government's primary litigative tool" for combating schemes to fleece the government. S. Rep. No. 99-345, at 2 (1986). It is broadly drafted to reach beyond common law fraud. *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (the FCA applies "expansively … 'to reach all types of fraud, without qualification, that might result in financial loss to the Government'") (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

42.     New Jersey has its own FCA, codified at N.J.S.A. § 2A:32C-1 *et seq*. Since the NJFCA is nearly identical to the federal FCA, below Relators recite from, and cite to, the federal FCA.

43.      As relevant here, the FCA imposes liability on any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A), (B) … or (G); or

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A), (B), (C) and (G).[1]

44.     As defined in the FCA, the terms "knowing" and "knowingly" mean that, with respect to information, a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or

---

[1] All citations are to the FCA as amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21.

falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Liability under the FCA requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B).

45.     The FCA further defines the term "claim" to mean any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

46.     The FCA defines the term "obligation" to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

47.     The FCA defines "material" objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This "natural tendency" test has long been the standard in determining materiality. *See, e.g., United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 761 (3d Cir. 2017); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 489-90 (3d Cir. 2017). The Supreme Court reaffirmed the natural tendency test and described a holistic approach to analyzing it. *See Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

**B.  The Federal Rivers & Harbors Act of 1899 (a/k/a the Federal Refuse Act)**

48.     For over a century, the FRA has prohibited the discharge of any refuse matter of any kind out of any ship, barge, or other floating craft of any kind, into any navigable water of the

United States, or into any tributary of any navigable water without a proper permit issued by the Secretary of the Army. 33 U.S.C. § 407.

49.     Although originally construed to apply to obstructions to navigation, since the mid-1960s this law has been construed to include all foreign substances and pollutants, except liquid sewage, and to specifically include petroleum products—as to which the government continues to use the law to enjoin further discharges and to compel remediation.

50.     Congress imposed substantial penalties for violating the FRA, mandating that:

> Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, 409, 414, and 415 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of up to $25,000 per day, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, . . .

33 U.S.C. § 411. This law is framed as a strict liability criminal statute.

51.     Congress also incentivized whistleblowers to come forward by authorizing that "in the discretion of the court, one-half of said fine [is] to be paid to the person or persons giving information." *Id*.

52.     The law also imposes liability against any vessel that is "used or employed in violating any of the provisions of sections 407 . . . of this title" for which the government may proceed *in rem* against the vessel to recover the "pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft." 33 U.S.C. § 412. Importantly, a judgment *in rem* against the vessel means the government can sell the vessel as a means of recovering the statutory penalties and damages.

53.     Later legislation, such as the CWA (*see* next section), did not supersede or repeal the FRA. Indeed, the CWA expressly preserved and respected the authority of the Secretary of the Army under the FRA. 33 U.S.C. § 1371(a); *see also* N.J.S.A. § 10A-6(e)(2). Permits under FRA

14

section 407, however, were transitioned to being issued under the CWA, as administered by the states. 33 U.S.C. § 1343(a)(4) & (5).

54.      While the FRA does not include a citizen suit provision, here Plaintiffs/Relators allege that Defendants are liable under the FCA for treble the FRA penalties and damages, plus FCA penalties, because they concealed their discharges of oil and other covered pollutants in order to reduce or avoid their obligation to pay FRA statutory penalties and damages (including clean-up costs) and to avoid the potential loss of their vessels in the event the government obtained judgements *in rem* against the vessels themselves.

**C.  The Federal Water Pollution Prevention and Control Act / Clean Water Act**

55.      The Federal Water Pollution Prevention and Control Act was originally enacted in 1948, and upon its 1972 reorganization and expansion became known as the Clean Water Act ("CWA") and was re-codified at 33 U.S.C. § 1251-1388.

56.      As stated by Congress:

The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter--

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

33 U.S.C.A. § 1251(a).

57.      Federal regulations implementing water pollution laws, such as the CWA, are promulgated both by the Coast Guard, at 33 C.F.R. Subchapter O, and by the Environmental Protection Agency, at 40 C.F.R. Subchapter D.

58.     The CWA includes a citizen suit provision. Therefore, in this action Plaintiffs/Relators allege both that Defendants are: a) directly liable under the CWA for statutory penalties; and b) liable under the FCA for treble the CWA penalties, plus FCA penalties, because they concealed their discharges in order to reduce or avoid their obligation to pay CWA's statutory penalties.

### 1.     **Pollutant**

59.     Generally, under the CWA, the discharge of any pollutant is unlawful without a permit. 33 U.S.C. § 1311(a).

60.     The term "pollutant" means "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

61.     The term "discharge of a pollutant" means any addition of any pollutant to navigable waters from any "point source," 33 U.S.C. § 1362(12)(A), and the term "point source" is defined to include any "vessel or other floating craft." 33 U.S.C. § 1362(14).

62.     The CWA is a strict liability law, and any person who violates this prohibition shall be liable for a penalty of not less than $5,000 or more than $50,000 per day of violation. Each violation shall be a separate offense. 33 U.S.C. § 1319(c)(2).

### 2.     **Sewage**

63.     Under the CWA, a "pollutant" that can be discharged[2] under a permit does not include "sewage[3] from vessels . . . within the meaning of section 1322 of this title." 33 U.S.C. §

---

[2]  The term "discharge" "includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping." 33 U.S.C. § 1322(9); 40 C.F.R. § 140.1.
[3] The term "sewage" means "human body wastes and the wastes from toilets and other receptacles intended to receive or retain body wastes." 33 U.S.C. § 1322(a)(6); 40 C.F.R. § 140.1.

1362(6); *see id.* § 1322(a)(12)(B) ("'discharge incidental to the normal operation of a vessel' does not include 'a discharge that is not covered by part 122.3 of title 40, Code of Federal Regulations'"); 40 C.F.R. § 122.3 ("The following discharges do not require NPDES [National Pollutant Discharge Elimination System] permits: (a) Any discharge of sewage from vessels"); 40 C.F.R. § 122.2 (EPA-administered NPDES permit programs explicitly define "pollutant" as excluding "[s]ewage from vessels").

64.    Instead, Congress completely prohibited the discharge of large volumes of untreated or inadequately treated sewage from vessels and mandated that:

> As soon as possible . . . the Secretary of the department in which the Coast Guard is operating [now the Department of Homeland Security] . . . shall promulgate Federal standards of performance for **marine sanitation devices** (hereafter in this section referred to as 'standards') which shall be designed to **prevent the discharge of untreated or inadequately treated sewage into or upon the navigable waters from new vessels and existing vessels, except vessels not equipped with installed toilet facilities**.

33 U.S.C. § 1322(b)(1) (emphasis added); *id.* § 1322(f)(1) (expressly pre-empting any state or political subdivision thereof from "adopting or enforcing any law concerning the design, manufacture, or installation or use of any marine sanitation device on any vessel subject to the provisions of this section").

65.    These Coast Guard "standards" are codified at 33 C.F.R. § 159.1 *et seq.*, whose stated purpose is to:

> Govern[] the design and construction of **marine sanitation devices** and procedures for certifying that marine sanitation devices meet the regulations and the standards of the Environmental Protection Agency promulgated under section 312 of the Federal Water Pollution Control Act (33 U.S.C. 1322), **to eliminate the discharge of untreated sewage from vessels into the waters of the United States, including the territorial seas**.[4]

---

[4] For purposes of regulating the design and construction of marine sanitation devices, the Coast Guard defines "territorial seas" as reaching only three miles from shore. 33 C.F.R. § 159.3 ("Territorial seas means the belt of seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of 3 miles."). Relevant here, this includes

Subpart A of this part contains regulations governing the manufacture and operation of vessels equipped with marine sanitation devices.

33 C.F.R. § 159.1 (emphasis added).

66.    In order to eliminate the discharge of sewage from vessels, they are required to be "designed and operated to either retain, dispose of, or discharge sewage, and shall be certified by the U.S. Coast Guard." 40 C.F.R. § 140.3(d). Specifically, they must be equipped with a Type I, II, or III marine sanitation device. 33 C.F.R. § 159.7(a). In general terms, Type I and II devices treat sewage to an acceptable level before discharging the effluent into the water, whereas Type III devices are storage tanks that are to be discharged onshore at a pump-out facility.

67.    States may apply to have certain waterways designated as "No-Discharge Zones," where the discharge of treated and untreated sewage is strictly prohibited by any size vessel. 40 C.F.R. § 140.4. Relevant here, the New York side of the Hudson River is designated as a No-Discharge Zone.[5]

68.    Here, the vessels operated by Defendants that discharged sewage are over 65 feet in length and are thus required to have a Type II[6] or Type III device. 33 C.F.R. § 159.7(a)(1).[7]

_____

Upper New York Bay, Lower New York Bay, and Raritan Bay, where NYW operates regular commuter ferry routes and various sightseeing excursions. Other laws, such as APPS, define territorial seas as reaching 12 miles from shore. *Compare to* 33 U.S.C. § 1901(a)(7).

[5] *See generally*, https://www.epa.gov/vessels-marinas-and-ports/vessel-sewage-no-discharge-zones (last accessed Oct. 4, 2020); https://www.epa.gov/vessels-marinas-and-ports/no-discharge-zones-map (last accessed Oct. 4, 2020).

[6] Type II devices must "produce[] an effluent having a fecal coliform bacteria count not greater than 200 per 100 milliliters and suspended solids not greater than 150 milligrams per liter." 33 C.F.R. §§ 159.3 and 159.53(b).

[7] A few of the vessels operated by Defendants (i.e., its Sea-Otter class, high-speed vessels) are exactly 65 feet in length and could be equipped with only a Type I device. 33 C.F.R. § 159.7(a)(2). Type I devices must "produce[] an effluent having a fecal coliform bacteria count not greater than 1,000 per 100 milliliters and no visible floating solids." 33 C.F.R. §§ 159.3 and 159.53(a). This technical possibility is a moot point, however, since Defendants Sea-Otter class vessels either were not equipped with restrooms, or the restrooms were kept locked and were never used.

69.     Given the fact that the New York side of the Hudson River is a No-Discharge Zone, all of the vessels operated by Defendants are equipped with a Type III marine sanitation device in the form of a 300-500-gallon storage tank. *See* 33 C.F.R. § 159.53(c) (a Type III "device must be designed to prevent the overboard discharge of treated or untreated sewage or any waste derived from sewage"); 33 C.F.R. § 159.3 (defining the term "Type III marine sanitation device").

70.     Any person who violates this prohibition shall be liable for a civil penalty of not more than $2,000 for each violation. Each violation shall be a separate offense. 33 U.S.C. § 1322(j).

### 3. **Oil**

71.     Congress declared:

The discharge of oil or hazardous substances (i) into or upon the navigable waters[8] of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone … or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States [], in such quantities as may be harmful as determined by the President under paragraph (4) of this subsection, is prohibited, except (A) in the case of such discharges into the waters of the contiguous zone or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States [], where permitted under the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, 1973, and (B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful. Any regulations issued under this subsection shall be consistent with maritime safety and with marine and navigation laws and regulations and applicable water quality standards.

33 U.S.C. § 1321(b)(3).

72.     The EPA's promulgating regulations pronounce that the discharge of oil in such quantities as "may be harmful" includes any discharge that violates applicable water quality

---

[8] The term "navigable waters" for this purpose is defined to mean "waters of the United States, including the territorial seas." 40 C.F.R. § 120.2.

standards or that "[c]ause a film or sheen[9] upon or discoloration of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R § 110.3.

73.     Importantly, the EPA strictly prohibits the "[a]ddition of dispersants or emulsifiers to oil to be discharged that would circumvent the provisions of this part." 40 C.F.R. § 110.4.

74.     Any person in charge of a vessel or facility shall notify the appropriate government agency of the spill as soon as he or she has knowledge of a discharge of oil or hazardous substance. 33 U.S.C. § 1321(b)(5); 40 C.F.R. § 110.6.[10]

75.     Any person in charge of any vessel or facility from which oil or a hazardous substance is discharged shall be subject to a civil penalty not to exceed $25,000 per day of violation. If the discharge is the result of gross negligence, the fine shall be not less than $100,000. 33 U.S.C. § 1321(b)(7).

76.     Relevant here, the bilge water of a vessel is typically polluted with oil, fuel, lubricants, and coolant from the engines and other mechanical devices. To control the discharge of oil in bilge water from U.S. vessels, the Coast Guard mandates that: "No person may operate a U.S. non-oceangoing ship in the navigable waters of the United States, unless it has the capacity

---

[9] The term "sheen" is defined to mean "an iridescent appearance on the surface of the water." 40 C.F.R. § 110.1.

[10] Under 18 U.S.C. § 1519, it is criminally unlawful for any person to knowingly alter, destroy, conceal, cover up, falsify, or make a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence an actual or contemplated investigation of a matter within the jurisdiction of any department or agency of the United States, and a conviction results in a fine and imprisonment for up to 20 years.

to retain on board all oily mixtures and is equipped to discharge these oily mixtures to a reception facility." 33 C.F.R. § 155.30.[11]

77.     In addition, in 2013 the EPA issued its Vessels General Permit ("VGP") under the CWA's National Pollutant Discharge Elimination System ("NPDES"). This permit covers 26 types of vessel discharges, including bilge water and oily water separator effluent. The VGP applies to all large commercial vessels of 79 feet in length or greater, which includes most of the vessels operated by Defendants.

**D.  MARPOL and the Act to Prevent Pollution From Ships (APPS)**

78.     The 1973 International Convention for the Prevention of Pollution from Ships and the protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships, (collectively known as MARPOL) is an international treaty to limit pollution from ships.

79.     As summarized by the United States Coast Guard, "the U.S. is signatory to Annexes I [oil], II [Noxious Liquid Substances in bulk], III [harmful packaged substances], V [garbage] and VI [air pollution]."[12] To implement this international convention, "Annexes I, II, V and VI have been incorporated into U.S. law by the Act to Prevent Pollution from Ships (APPS) and implemented within 33 USC 1901 and 33 CFR 151."[13]

---

[11] The EPA's regulation on this issue only notes that the discharge of bilge water in compliance with MARPOL 73/78, Annex I, as provided in 33 C.F.R. Part 151, Subpart A [set at 15 ppm] are not deemed "harmful." 40 C.F.R. 110.5(a).

[12] https://www.dco.uscg.mil/Our-Organization/Assistant-Commandant-for-Prevention-Policy-CG-5P/Inspections-Compliance-CG-5PC-/Commercial-Vessel-Compliance/Domestic-Compliance-Division/MARPOL/ (last accessed Nov. 4, 2020).

[13] *Id.* In addition, "[t]he U.S. incorporates Annex III by the Hazardous Materials Transportation Act (HMTA) implemented within 46 USC 2101 and 49 CFR 171 -174 and 176. Although the U.S. has not ratified Annex IV, the U.S. has equivalent regulations for the treatment and discharge standards of shipboard sewage – the Federal Water Pollution Control Act (FWPCA) as amended by the Clean Water Act and implemented by 33 USC 1251 and 33 CFR 159." *Id.*

80.     APPS makes it unlawful for any person to knowingly violate MARPOL, APPS, or the federal regulations promulgated under APPS. 33 U.S.C. § 1907(a). Persons who violate MARPOL or APPS can be held liable both criminally and civilly. 33 U.S.C. § 1908.

81.     MARPOL and APPS apply to "ships," which term is broadly defined as "a vessel of any type whatsoever, including hydrofoils, air-cushion vehicles, submersibles, floating craft whether self-propelled or not, and fixed or floating platforms." 33 U.S.C. § 1901(12).

82.     APPS applies to all United States registered vessels, wherever located, when operating under the authority of the United States. 33 U.S.C. § 1902(a)(1).

83.     MARPOL and APPS specifically prohibit the discharge of sewage and oil or petroleum products and require the documentation of any discharge. The documentation is to include an indication regarding the facts and circumstances surrounding any discharge; the notation is to be signed by the person in charge of the operation, usually the Chief Engineer; and each page must be signed by the Master of the Ship. This documentation is to be maintained for regular inspection by the United States Coast Guard. 33 U.S.C. § 1906(a), (b).

84.     The implementing regulations concerning oil apply to all U.S. vessels, except those "operated exclusively on the internal waters[14] of the United States." 33 C.F.R. §151.09. In the present case, the NYW ferries do not operate exclusively within the limits of the Hudson River and East River, but also in the intra-coastal waterway, including Upper New York Bay, Lower New York Bay, and Raritan Bay.

85.     Relevant here, the APPS regulations mandate that no person may operate a vessel within or beyond 12 nautical miles of the nearest land of the United States unless it either: has the

---

[14] "Internal waters" is defined as "shoreward of the territorial sea baseline," 33 C.F.R. § 2.24, and "territorial sea baseline" is defined as generally being the "mean low water line of the coast."

capacity to retain all oily mixtures and is equipped to dispose of those oily mixtures to a proper reception facility; or is equipped with approved oily-water separating equipment (OWS) and discharges into the sea with an oil content of not more than 15 parts per million, provided that the discharge does not contain "chemicals or other substances introduced for the purpose of circumventing the conditions of discharge specified in this regulation." 33 C.F.R. § 151.10.

86.     MARPOL defines "discharge" as any release of harmful substances from a ship however so caused. MARPOL Art. 2 (3)(a).

87.     "Harmful substances" are defined as any substance introduced into the sea that is liable to create hazards to human health, to harm living resources and marine life, to damage amenities, or to interfere with other legitimate uses of the sea. MARPOL Art. 2 (2).

88.      "Navigable waters" includes the territorial sea of the United States, which extends 12 nautical miles from the baseline of the United States, and the internal waters of the United States. 33 U.S.C. § 1901(a)(7).

89.     As a strict liability law, a violation of the MARPOL protocol or APPS renders an individual liable to the United States for a civil penalty not to exceed $25,000 for each violation, and each day of a continuing violation constitutes a separate violation. 33 U.S.C. §§ 1908 (a) and (b); 33 C.F.R. § 158.115(a). In addition to a determination of a fine, the person committing a violation of MARPOL commits a class D felony.

90.     In addition, a knowing violation of MARPOL protocol or APPS renders an individual liable for a fine of not more than $50,000 for each violation. 33 C.F.R. § 158.115(b).

91.     The APPS further provides that the Court may pay to the person giving information leading to conviction not more than half of any fine paid. 33 U.S.C. § 1908 (a) & (b).

**E.  The New Jersey Water Pollution Control Act**

92.     The NJWPCA is codified at New Jersey General and Permanent Statutes § 58:10A-1, *et seq*., and is to be liberally construed. N.J.S.A. § 58:10A-12.

93.     As stated in N.J.S.A. § 58:10A-2:

The Legislature finds and declares that pollution of the ground and surface waters of this State continues to endanger public health; to threaten fish and aquatic life, scenic and ecological values; and to limit the domestic, municipal, recreational, industrial, agricultural and other uses of water, even though a significant pollution abatement effort has been made in recent years. It is the policy of this State to restore, enhance and maintain the chemical, physical, and biological integrity of its waters, to protect public health, to safeguard fish and aquatic life and scenic and ecological values, and to enhance the domestic, municipal, recreational, industrial and other uses of water.

94.     To effectuate the state's policy of enhancing the water quality in the State, the legislature further found that it is in the public interest "to minimize direct regulation by the Federal Government of wastewater dischargers by enacting legislation which will continue to extend the powers and responsibilities of the Department of Environmental Protection for administering the State's water pollution control program, so that the State may be enabled to implement the permit system required by the Federal [Water Pollution Control] Act." *Id.*

95.     The New Jersey legislature then proclaimed that it is "unlawful for any person to discharge any pollutant,[15] except as provided pursuant to subsections d. and p. of this section, or when the discharge conforms with a valid New Jersey Pollutant Discharge Elimination System permit that has been issued by the commissioner  pursuant to P.L.1977, c. 74 (<u>C.58:10A-1 et seq.</u>)

---

[15] "Pollutant" under the NJWPCA means any dredged spoil, solid waste, incinerator residue, sewage, garbage, refuse, oil, grease, sewage sludge, munitions, chemical wastes, biological materials, radioactive substance, thermal waste, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal or agricultural waste or other residue discharged into the waters of the State.  "Pollutant" includes both hazardous and nonhazardous pollutants. N.J.S.A. § 58:10A-3(n).

or a valid National Pollutant Discharge Elimination System permit issued by the administrator pursuant to the Federal Act." N.J.S.A. § 58:10A-6.

96.     The legislature also authorized the commissioner to promulgate regulations that exempt from the requirement to obtain a permit, certain categories of discharge, in whole or in part, including "[d]ischarges of any pollutant from a marine vessel or other discharges incidental to the normal operation of marine vessels." N.J.S.A. § 58:10A-6(d)(2). Importantly, the commissioner has not promulgated any regulations exempting any marine vessel discharges for any size vessel, and certainly not for commercial vessels greater than 65 feet in length.

97.     To ensure the protection of coastal areas, the legislature flatly prohibited the issuance of "a permit to any private, commercial, or industrial applicant for the discharge of any solid, semi-solid, or liquid wastes into ocean waters[16] of the State, the provision of any other law, or rule or regulation to the contrary notwithstanding." N.J.S.A. § 58:10A-7.1. This includes the New Jersey side of Upper New York Bay, Lower New York Bay, and Raritan Bay.

98.     As a strict liability law, any person who violates this act shall be subject to a civil penalty, upon order of a court, not to exceed $50,000 per day of such violation, and each day's continuance of the violation shall constitute a separate violation. N.J.S.A. § 58:10A-10(e). The violator may also be liable to pay "the amount of any actual economic benefits accruing to the violator from the violation." *Id.*

99.     In addition, any person who "purposely, knowingly, or recklessly violates this act, and the violation causes a significant adverse environmental effect, shall, upon conviction, be guilty of a crime of the second degree, and shall, notwithstanding the provisions of subsection a.

---

[16] The legislature defined "ocean waters" as "those waters of the open seas lying seaward of the base line from which the territorial sea is measured, as provided for in the Convention on the Territorial Sea and the Contiguous Zone." *Id.*

of N.J.S.2C:43-3, be subject to a fine of not less than $25,000 nor more than $250,000 per day of violation, or by imprisonment, or by both." N.J.S.A. § 58:10A-10(f)(1)(a).

100.    For purposes of the foregoing provision, a "significant adverse environmental effect" exists when Defendants' conduct causes: 1) "serious harm or damage to wildlife, fish, marine life, or to their habitats"; 2) serious harm, or degradation of, any ground or surface waters used for drinking, agricultural, navigational, recreational, or industrial purposes"; or 3) "any other serious articulable harm or damage to waters of [New Jersey], including ocean waters subject to its jurisdiction pursuant to N.J.S.A. § 58:10A-47 et seq.]." N.J.S.A. § 58:10A-10(f)(1)(b).

101.    Even if there is not a "significant adverse environmental effect," the NJWPCA provides additional penalties for "purposely, knowingly, recklessly," or "negligently" violating the Act, "including making a false statement, representation, or certification in any application, record, or other document filed or required to be maintained under this act, or by falsifying, tampering with, or rendering inaccurate any monitoring device or method required to be maintained pursuant to this act, or by failing to submit a monitoring report, or any portion thereof." N.J.S.A. § 58:10A-10(f)(2) & (3); N.J.A.C § 7:14-8.6.

102.    Severe penalties are also imposed upon any person or corporation "who purposely or knowingly violates an effluent limitation or other condition of a permit, or who discharges without a permit, and who knows at that time that he thereby places another person in imminent danger of death or serious bodily injury, as defined in [N.J.S.A. § 2C:43-3]." N.J.S.A. § 58:10A-10(f)(4).

103.    The NJWPCA also imposes mandatory civil administrative penalties of $1,000 for "each serious violation" and $5,000 "for the violation that causes the violator to be, or continue to be, a significant noncomplier." N.J.S.A. § 58:10A-10.1(a)-(d).

26

104.    While the NJWPCA does not include a citizen suit provision, here Plaintiffs/Relators allege that Defendants are liable under the NJFCA for treble the NJWPCA penalties, plus FCA penalties, because they concealed their discharges in order to reduce or avoid their obligation to pay NJWPCA statutory penalties.

**VI.        FACTUAL ALLEGATIONS**

**A.  General Background on Defendants' Operations**

105.    NYW has a fleet of over 30 vessels, which it uses to transport passengers across the Hudson River between New Jersey and New York, across Raritan Bay to Belford, New Jersey, and for sightseeing and special event excursions in the Hudson River, East River, Upper New York Bay, Lower New York Bay, and Raritan Bay. These vessels range in length from 65 feet to almost 100 feet and carry between 97 and 399 passengers.

106.    NYW picks up and drops off passengers on the New Jersey side of the Hudson River at the Port Imperial / Weehawken Ferry Terminal, depicted below, which NYW employees refer to as the "Terminal Dock":

PHOTO C:



107.    Daily, over a dozen vessels are serviced at NYW's work dock (hereafter "NYW Work Dock") located at 4800 Port Imperial Boulevard, Weehawken, New Jersey 07086. Photo D below is an aerial photo of the NYW Work Dock:

PHOTO D:



108.    The NYW Work Dock is accessed from land via a 100-foot gangway dock. The working part of the dock is comprised of two barges surrounded by a lattice of slips that can accommodate approximately a dozen vessels.

109.    NYW does not directly own the "water land" upon which is situated the NYW Work dock. Rather, NYW rents the water land from Romulus Development Corp. These entities share common ownership and control. In particular, NYW is owned by Arthur Imperatore Sr., who is also a partial owner of Romulus Development Corp.

110.    Just to the south of the NYW Work Dock, and also visible in Photo D (Paragraph 107 above), is a shorter dock with four slips where NYW services its finest vessels, which are used exclusively for Goldman Sachs' commuters and special events.

111.    The two premiere vessels, the York and Jersey, are serviced at the Goldman Dock on alternating evenings, but are not moored overnight at either of the maintenance docks.

112.    In about 2004, Wachtel formed Billybey Wachtel to take over the debt payments on approximately sixteen of the ferries in the NY Waterway's fleet. The Port Authority of NY/NJ ("PANYNJ") brokered the controversial deal to avert a shutdown of NYW, which struggled financially during the economic downturn precipitated by the September 11, 2001 World Trade Center attacks. The deal included an Asset Purchase Agreement executed on about December 20, 2004, and a Vessel Management Agreement executed in about February 2005.

113.    In about 2016, NYW was reported to have acquired the assets of Billybey, its eleven commuter ferries, and the rights to operate between Hoboken, New Jersey and Manhattan. During the period of time from 2004 to 2016 when Billybey had an ownership interest in the ferries, NYW at all times operated and maintained the vessels.

114.    In addition, at the time of NYW's 2016 buyback, Billybey executed a leaseback agreement for the two top-of-the-line ferries used almost exclusively to ferry Goldman Sachs employees. Under this arrangement, Billybey collects the revenue from the lease with Goldman Sachs, while NYW is obligated to operate and maintain the vessels in a pristine manner for the benefit of Billybey/Wachtel's well-heeled clientele.

115.    The chart below provides the names and details of some the vessels operated by Defendants during Plaintiffs/Relators' employment with NYW, and from which the

Plaintiffs/Relators observed, and as part of their employment were forced to participate in, the illegal discharging of raw sewage, oil, fuel, coolant, and other pollutants into the Hudson River.

| Vessel Name | **Garden State** |
|---|---|
| Vessel Service | Passenger (Capacity: 399) |
| Ship Details | Built: 1992; Hull Length: 92 ft; Gross Tonnage: 95 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **Abraham Lincoln** |
| Vessel Service | Passenger (Capacity: 399) |
| Ship Details | Built: 1989; Hull Length: 87 ft; Gross Tonnage: 95 |
| Hailing Port | New York, NY |
| Vessel Name | **Moira Smith** |
| Vessel Service | Passenger (Capacity: 97) |
| Ship Details | Built: about 2001; Hull Length: 65 ft; Gross Tonnage: 55; Sea-Otter Class "high speed" (35 mph) |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **Christopher Columbus** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2000; Hull Length: 79 ft; Gross Tonnage: 82 |
| Hailing Port | Weehawken, NJ |

| | |
|---|---|
| Vessel Name | **Henry Hudson** |
| Vessel Service | Passenger (Capacity: 350) |
| Ship Details | Built: 1992; Hull Length: 92 ft; Gross Tonnage: 95 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **York** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2010; Hull Length: 69 ft; Gross Tonnage: 79 |
| Hailing Port | New York, NY |
| Vessel Name | **Jersey** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2010; Hull Length: 69 ft; Gross Tonnage: 76 |
| Hailing Port | New York, NY |
| Vessel Name | **Robert Fulton** |
| Vessel Service | Passenger (Capacity: 350) |
| Ship Details | Built: 1993; Hull Length: 92 ft; Gross Tonnage: 95 |
| Hailing Port | Port Imperial, NJ |
| Vessel Name | **George Washington** |
| Vessel Service | Passenger (Capacity: 399) |

| | |
|---|---|
| Ship Details | Built: 1989; Hull Length: 87 ft; Gross Tonnage: 95 |
| Hailing Port | New York, NY |
| Vessel Name | **Brooklyn** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2010; Hull Length: 69 ft; Gross Tonnage: 76 |
| Hailing Port | New York, NY |
| Vessel Name | **Fiorello LaGuardia** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2002; Hull Length: 79 ft; Gross Tonnage: 82 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **Thomas Jefferson** |
| Vessel Service | Passenger (Capacity: 399) |
| Ship Details | Built: 1989; Hull Length: 87 ft; Gross Tonnage: 95 |
| Hailing Port | New York, NY |
| Vessel Name | **Jersey City** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2010; Hull Length: 79 ft; Gross Tonnage: 82 |
| Hailing Port | Weehawken, NJ |

| | |
|---|---|
| Vessel Name | **Hoboken** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2002; Hull Length: 79 ft; Gross Tonnage: 82 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **Bayonne** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 2003; Hull Length: 79 ft; Gross Tonnage: 82 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **Empire State** |
| Vessel Service | Passenger (Capacity: 399) |
| Ship Details | Built: 1993; Hull Length: 92 ft; Gross Tonnage: 95 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **Yogi Berra** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 1999; Hull Length: 79 ft; Gross Tonnage: 89 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **Alexander Hamilton** |
| Vessel Service | Passenger (Capacity: 399) |

| Ship Details | Built: 1989; Hull Length: 87 ft; Gross Tonnage: 95 |
|---|---|
| Hailing Port | New York, NY |
| Vessel Name | **Frank Sinatra** |
| Vessel Service | Passenger (Capacity: 149) |
| Ship Details | Built: 1999; Hull Length: 79 ft; Gross Tonnage: 89 |
| Hailing Port | Weehawken, NJ |
| Vessel Name | **John Stevens** |
| Vessel Service | Passenger (Capacity: 399) |
| Ship Details | Built: 1996; Hull Length: 92 ft; Gross Tonnage: 93 |
| Hailing Port | Weehawken, NJ |

116.    Plaintiffs/Relators also were forced to participate in, or observed, Defendants' illegal discharge of raw sewage, oil, fuel, coolant, and other pollutants from the following large vessels (i.e., over 65 feet in length) operated by Defendants: the Frank R Lautenberg, Robert A. Roe, Thomas H. Kean, Admiral Richard E. Bennis, Patriot, Peter R. Weiss, Manhattan, Port Imperial New Jersey, and the pair named Bravest and Finest (which were later replaced by the Molly Pitcher and Betsy Ross).

117.    Plaintiffs/Relators also reasonably believe, based on their personal knowledge and experience with Defendants' policies and practices, that Defendants also discharged from some or all of the foregoing vessels raw sewage and other pollutants into other local waterways while

"running open" (i.e., allowing vessels to open during transit a pipe running from the bottom of the sewage holding tank to the exterior of the vessel's stern such that gravity and suction from the vessel's speed would empty the tank).

118.    Plaintiffs/Relators also were forced to participate in, or observed, Defendants' illegal discharge of oil, fuel, coolant, and other pollutants from the Capt. Mark Summers and from the following smaller Sea-Otter class, high speed vessels (like the Moira Smith in the chart above): the Austin Tobin, Mychal Judge, Fred V. Morrone, Douglas B. Gurian, and Enduring Freedom. These vessels, however, did not have functioning restrooms, and therefore were not the source of raw sewage discharges into the Hudson River.

119.    Due to vessel retirements, sales, and acquisitions, the foregoing list of vessels Defendants operated during the relevant period of time, and from which raw sewage, oil, fuel, coolant, and other pollutants were illegally discharged, is not exhaustive.

**B.  Plaintiffs'/Relators' Employment Duties at NYW**

120.    Messrs. Khatchikian and Torres worked the overnight shift, scheduled from 6:00 p.m. to 2:30 a.m., on the NY Work Dock and the Goldman Dock. They held different positions, but often worked on the same nights.

121.    Torres was employed by NYW from the fall of 2011 through August 2015 as a C-Level preventative maintenance mechanic. Torres performed C-Level mechanic duties, such as oil changes and other light maintenance and repair tasks, higher A-Level mechanic duties, and back-up fueler duties when the regular fueler had a day off. There were typically 6-8 mechanics working the night shift.

122.     Khatchikian began his employment with NYW on September 23, 2013 as a fueler. During each night shift, NYW scheduled only one fueler who had to perform a large volume of tasks without any assistance.

123.     After Khatchikian successfully completed 90 days of employment, he became part of Local 447, the union representing the workers at NYW.

124.     Khatchikian's job was to single-handedly record the engine hours on each vessel, fuel the vessels, check the oil, pump out the sewage holding tanks on each vessel, refill fresh water tanks as needed, and attend to similar needs on the repair dock and workplace. Khatchikian was required to complete a log book noting the particular tasks performed on each vessel during each shift.

125.     Torres performed these same tasks when he was required to perform the fueler's duties.

126.     Due to the large volume of work and the number of boats requiring refueling and clean-out service, it was common for the fueler to finish work at 4:30 or 5 a.m.

**C.  Defendants' Routine Discharge of Raw Sewage**

127.     From the beginning of his employment, one of Khatchikian's duties as a fueler included disposing of sewage from the Type III marine sanitation devices aboard both the commuter vessels and the permanently docked work barges (i.e., the holding tanks for the employee restrooms). These devices, which ranged from 200-500 gallons, stored wastewater and sewage from the bathrooms aboard the vessels and barges.

128.     At no time did NYW ever bring a portable sewage pumping truck to the NYW Work Dock or to the NYW Goldman Dock for the purpose of pumping sewage from the vessels or barges.

129.     The only "proper" and legal method made available for doing so was a stationary pump set-up that included an intake hose (always green to avoid confusion with other hoses on the docks), connected to a fitting on the stern of a vessel, and an outflow hose that supposedly went to a municipal sanitary sewer inlet along the shore, near the Goldman Dock.

130.     Khatchikian and Torres were led to believe by Defendants that the properly disposed sewage is put into the sewer system operated by the Weehawken Sewerage Authority. If true, there typically is no direct cost imposed for dumping sewage into the municipal sewer system. The sewerage authority does not meter, tabulate, or measure the volume of sewerage from Defendants. As a general rule, most sewerage authorities base "sewerage rates" on the volume of water used by a particular user. The sewerage rate is calculated based upon the water meter measuring the volume of water going into a user's facility.

131.     For the NYW Work Dock, the stationary pump was located on the northwest corner of the work barge closest to shore. The green intake hose was about 150 feet long, which was inadequate to reach all of the vessels on the NYW Work Dock, especially since the stern of the vessels were typically not pointed toward the pump and there was no licensed pilot available during the night shift to move any of the vessels. The black outflow hose, which was 3-4" in diameter, was hundreds of feet long, travelling down the gangway and then south along the shore to the supposed municipal sanitary sewer inlet near the NYW Goldman Dock. The outflow hose did not have any auxiliary pumps to aid the movement of the thick sewage that was to be pumped through it for hundreds of feet. For convenience, Photo D is reprinted below for reference.

PHOTO D (Same as above in Paragraph 107):



132.   For the NYW Goldman Dock, the stationary pump was located on land and very

near to the supposed municipal sanitary sewer inlet along the shore near the small trees in the upper

left of Photo D above. Hence, the 3-4" black outflow hose for this stationary pump was not more

than 150 feet long. Like at the other dock, the green intake hose was about 150 feet long.

133.   In general, raw sewage discharges into the Hudson River at the NYW Goldman

Dock were not as common as at the NYW Work Dock, where it was essentially a nightly

occurrence from multiple vessels.

134.     This was due, in part, to the fact that the NYW Goldman Dock's sewage pump inlet hose was long enough to reach all four vessels. Exceptions occurred when vessels were not pulled up far enough, which could not be corrected because there were no licensed pilots at the docks in the middle of the night. In addition, the outlet hose was less than 150 long, which meant that the NYW Goldman Dock sewage pump tended to have better suction and perform better than the sewage pump at the NYW Work Dock.

135.     At both work docks, however, due to the small size of the dock-to-land sewage pumps, it would take 15-20 minutes to empty a 200-gallon tank of thick sewage—assuming no downtime due to clearing clogged material or pump breakdowns (which frequently occurred due to tampons, paper towels, and other debris thrown into the toilets). Pumping larger tanks, like those found on the Port Imperial New Jersey, could take upwards of 45 minutes.

136.     During the pump-out process, the fueler had to remain close to the pump and monitor its performance. If the hoses or the pump itself became clogged, the fueler had to immediately turn off the pump in order to avoid destruction of the impeller or burnout of the entire pump motor. Clogs were frequent due to the presence of tampons, paper towels, and other debris thrown into the septic tanks. When clogs occurred, the fueler was required to locate the clog and, using his or her hand covered only in thin latex or plastic gloves that frequently tore, remove the feces-covered debris. The risk of infection was a serious job hazard; one fueler who worked prior to Khatchikian's tenure got a staph infection from his contact with the sewage.

137.     When pumps, impellers, hoses, or other parts of the system broke, which frequently occurred, mechanics, including Torres, repaired them.

138.     Logistically, at the NYW Work Dock, moving the intake hose from one vessel to another (at least to the few vessels that could be reached) required a considerable amount of time

and often involved dangerous work to string the hose around and across dock structures, other vessels, and open water.

139.    In addition, during freezing weather, the discharge hoses running down the dock, across the shore, and to the supposed municipal sanitary sewer inlet would freeze solid, thereby completely preventing their usage to properly pump sewage.

140.    From the beginning of their employment, Khatchikian and Torres were threatened with termination if they did not complete all of the night's assigned tasks for each vessel and have them ready to go in the morning.

141.    Khatchikian's supervisors knew of the foregoing limitations of the stationary sewage pump-out system, yet were not receptive to his complaints that the systems were inadequate to properly perform the job. Instead, the supervisors commanded him to do whatever was necessary to "get the job done." Khatchikian quickly learned what his supervisors meant.

142.    From the beginning of his employment, Khatchikian was directed to discharge raw sewage from restrooms aboard the commuter vessels into the Hudson River using one of three methods described below. Torres was also directed to participate in the illegal discharge of sewage into the Hudson River when he worked as a fueler.

143.    Torres informed Khatchikian that it was not possible to refuse Defendants' directive to discharge raw sewage into the river and related the fact that the three previous fuelers were terminated as soon as they complained about the practice.

144.    As part of the general effort to conceal the severity of their actions, the workers and supervisors colloquially referred to the raw sewage and waste as "sullage," even though the modern meaning of that term is limited to non-sewage waste water. They also poured gallons of Aqua Kem into the sewage holding tanks to reduce the odor.

41

145.   Sewage was discharged directly into the Hudson River when: a) the stationary pump's intake hose could not reach the Type III device's connector located at the stern of a vessel; b) there was such a large volume of work to be done that the sewage could not be transferred to land in a timely fashion as determined by the operators of Defendants; c) the stationary pump was broken (often caused by debris); or d) the hoses were clogged with debris or frozen.

146.   Defendants illegally dumped raw sewage into the Hudson River in four ways. The first method was by using the stationary pump and its intake hose, but replacing the outflow hose going to land with a short hose just long enough to direct the raw sewage into the river or, at times, long enough to be submerged into the water to hide the discharge from public sight.

147.   The second method was to use a small portable pump with a short discharge hose that was also just long enough to carry the sewage over the side of the vessel, as illustrated by Photos A & B in Paragraph 2 above. Photo E below is a close-up photo of the portable pump, which Khatchikian also sometimes took up to the NYW passenger terminal in order to pump out the sewage tanks of vessels that were moored there overnight.

PHOTO E:



148.    The third way Defendants discharged vessel sewage was by using an onboard pump that simply required turning on a switch on the fuse panel labeled "sullage," which was often done while the vessel as underway in open water, as well as by the fuelers when the vessels were docked. This onboard sewage pump was installed on the single-deck catamarans, such as the Jersey City, Bayonne, Robert Roe, Governor Thomas H. Kean, and Admiral Richard E. Bennis vessels.

149.    The fourth way Defendants discharged vessel sewage was only available on certain vessels, such as the Senator Frank R. Lautenberg, used for long distance trips up the East River or across Raritan Bay. These vessels had a pipe running from the bottom of the sewage holding tank to the exterior of the vessel's stern that, when opened during transit, simply allowed gravity and suction from the vessel's speed to empty the tank. This practice of "running open" was routinely used during long trips to ensure that that vessel's restrooms remained clean and odor-free. In fact, on many occasions when such boats were approaching the NYW Work Dock, and as Khatchikian was getting ready to use the Mafioso pump to discharge the sewage, the boat captain would told him words to the effect of "you don't have to worry about this one, we already took care of it."

43

150.     When Khatchikian initially inquired as to how to effectively discharge the sewage at the beginning of his employment with Defendants, he was instructed to utilize an electric portable pump that was fitted with the requisite hardware to attach to on-board marine sanitation devices. The portable electric pump was utilized so frequently that Defendants actually maintained spare pumps and extra parts for the pumps on-site. A close-up of the portable pump as installed is shown in Photo F below:

PHOTO F:



151.     Reflecting Defendants' knowledge of the illegality of using the portable pump to discharge raw sewage into the Hudson River, one of the managers, Ralph Staiano, has an actual

nickname for the pump; he calls it "Mafioso!" Moreover, the illicit pump's usage is so common and well-known among NYW personnel that on at least one occasion in the winter of 2015, Khatchikian observed a boat captain request the pump so that he could use it to effectuate a quick turn-around of his vessel.

152.   Torres took a video in October 2014 showing NYW illegally dumping sewage from the "Jersey" into the Hudson River using the Mafioso pump. Torres can be heard stating, "Dumping shit into the river. Sullage. This is done on a regular basis."

153.   There were many occasions when the number of commuter vessels which needed service was so high that Khatchikian and Torres were instructed to pump the sewage directly into the Hudson River to expedite the availability of the commuter vessel for the next scheduled commuter trip, contracted excursion, or overnight dockage.

154.   Torres is aware that Defendants kept paper records in file cabinets on the main floor of the NYW Work Dock with notes indicating use of the pump, including phrases such as "use electric pump," "sullage," and "call me." Torres understood based on his own experience that these, and other similar phrases, indicated use of the Mafioso pump to dump sewage into the Hudson River.

155.   In about February 2015 utilizing a cellular phone, Khatchikian took photographs, including Photos G and H below, showing the direct discharging of sewage from the vessel "Garden State" and the vessel "Henry Hudson" into the Hudson River. Khatchikian believes that this was being done due to the weather conditions and an inability to pump the sewage ashore. When the sewer lines are frozen, ALL sewage from ALL vessels is discharged into the Hudson River.

PHOTO G:



PHOTO H:



156.    Depending on the number of commuters on the vessel and the size of the marine

sanitation device, the discharge of sewage into the Hudson River would vary between 100 and 500

gallons from just one vessel. Depending on the weather (i.e., below freezing) and whether it was

a high-volume activity day (for example, viewing fireworks on the 4th of July), employees for

Defendants could easily discharge over 2,000 gallons of raw sewage from 20 vessels directly into

the Hudson River in a single day.

157.    On numerous occasions, Plaintiffs/Relators and other employees complained to management and union representatives on the job regarding what they believed to be an illegal activity, specifically, discharging sewage, pollutants, and oil into the Hudson River. Khatchikian specifically reported his concerns to union representative Mike Siskas and Juan Negron. Mr. Siskas told Khatchikian, on more than one occasion, that he was aware that it was illegal, but if the company "got into trouble," he would lose his job.

158.    Khatchikian also specifically reported his concerns to Ralph Staiano and two ex-managers "Fred" and J.P.[17]  Further, on occasion, Khatchikian was told by these individuals that, due to the "expensive contracts" with the city of New York and Goldman Sachs, discharging the sewage into the river was required to keep the contracts. Any complaints regarding the onboard restrooms or the cleanliness of the vessel could affect Defendants' lucrative contracts.

159.    Many times, in response to Khatchikian's concerns, his managers would tell him words to the effect, "I don't care how you get it done, just make sure they are pumped out!" Hence, on every occasion that Khatchikian discharged raw sewage into the Hudson River, he was doing it because Defendants had instructed and expected him to do so.

160.    Similarly, Torres complained often to management and the union representatives to no avail. Torres also spoke directly with Khatchikian indicating that it was "wrong that they were dumping shit into the river."

161.    The fact is that Defendants understood that discharging raw sewage into the Hudson River was illegal, and Defendants' employees discussed the practice on a regular basis.

---

[17] Plaintiffs/Relators are in possession of the full names of witnesses identified by initials throughout the Amended Complaint.

162.    Although not an exhaustive list, the following represent some examples of the personal knowledge of individuals and their interaction:

a.    On at least one occasion, the NYW Vice President, Alan Warren, personally told Torres that "the Coast Guard isn't around, so just do what you gotta do," referring to discharging raw sewage into the Hudson River.

b.    Khatchikian has observed NYW Vice President Alan Warren witness sewage going into the Hudson River when coming to the port captain's office. On one occasion, Khatchikian observed Warren walk past employees A.K. and P.R. during the process of discharging sewage from the "stationed" pump into the Hudson River.

c.    Deck hands P.M., J.D., J.G., L.A.; mechanics D.W. and B.B.; and Captains G.S. and J.M. have all witnessed the sewage being discharged directly into the Hudson River. There are a number of other current and former employees who have witnessed this activity.

163.    Defendants operate "excursion" boats for special events depending on the time of year. For example, it is expected that over the Fourth of July weekend, when New York City has parades and fireworks, there will be a high level of activity for Defendants. Historically, the July 4th weekend has resulted in the direct discharge of sewage into the Hudson River to expedite the cleaning and fueling of the vessels so they can quickly return to take passengers between New York and New Jersey.

164.    In addition to sink water and human waste, the sewage can contain many other waste items placed into the sink or toilets aboard the vessel by passengers. One such example is tampons, which are mentioned here because it was not unusual for a tampon to damage the rubber impeller within the electric pump when sewage was being discharged into the Hudson River. This

was such a well-known eventuality that Defendants kept a stock of rubber impellers on-site for repairs. Mechanics Torres, P.R., and A.K., employees of Defendants, are personally familiar with the repair of the electric pump and the damage to the rubber impeller.

**D.  Defendants' Routine Discharge of Oil, Fuel, and Coolant**

165.    Defendants failed to follow proper disposal procedures regarding oil, oil filters and fuel filters. Photo I below shows oil filters in a dumpster believed to be owned by the disposal company Waste Management. Torres tore open the black plastic bags to reveal their contents and took the photo on March 14, 2015.

PHOTO I:



166.    Torres took pictures of signage at the NYW Work Dock stating that the discharge of oil and waste is prohibited. These images, Photos J and K below, illustrate Defendants were well aware of the prohibition against discharging oil and waste and of their responsibilities in the event any discharges took place.

PHOTO J:



PHOTO K:



167.    Oil changes were performed on vessels at both the NYW Work Dock and the NYW Goldman dock. It was common for significant quantities of oil to be spilled into the engine room, in addition to the oil, fuel, lubricants, and coolant that routinely leaked into the bilge. The NYW mechanics routinely used the bilge pump to discharge the severely polluted bilge water into the Hudson River. In order to conceal the discharge, the mechanics often turned on the engine and engaged the propellers in order to churn the water and disperse the discharge.

168.    At least 1-2 times a month, Plaintiffs/Relators also observed NYW's mechanics (Steve, Ben, Domingo, Gusto, and D.W.) in white Tyvek suits discharging bilges, with sea water mixed with oil, coolant, and fuel into the Hudson River. Plaintiffs/Relators also observed that NYW's mechanics kept cases of Dawn liquid detergent, known for its ability to disperse oil, in their storage shed and mixed it into the bilge water of a vessel before illegally discharging the bilge water into the Hudson River.

169.    In addition, the fuelers and mechanics were tasked with washing down the engine room with Dawn dish detergent. After the fueler washed down the engine room with Dawn dish detergent, the bilge contents were severely polluted with oil, fuel, lubricants, coolant and the dispersant. Defendants, however, did not properly pump out the bilge to a land-based separation system and then properly dispose of the petroleum pollutants. Instead, a mechanic would turn on the engine or generator and then activate the onboard bilge pump to discharge the polluted mixture directly into the Hudson River. This practice of washing down vessel engine rooms and discharging the dirty bilge water into the river was a common practice prior to a Coast Guard inspection.

170.    On or about June 30, 2015, at approximately 22:00 hours, Khatchikian experienced a fuel spill at the workplace. Khatchikian was working with two vessels and did not know that a secondary valve had been left open going to the second vessel that he was going to be sequentially fueling, which allowed the fuel to spill into the Hudson River. Pursuant to the company's instructions, Khatchikian contacted manager Allen Warren. Khatchikian advised Warren that the spill was somewhere between 300 and 350 gallons of fuel which had gone into the Hudson River. Warren told the Khatchikian that "if anybody asks" about the amount of fuel, he was to indicate that it was between 30 and 60 gallons.

171.    Fuel spills were so frequent that NYW actually had a procedure to "disperse" the petroleum sheen on the river when the spill occurred. Managers would simply start the engine on the vessel while keeping it tied to the dock. The spinning of propellers while at dock caused the petroleum sheen to disperse. Additionally, these fuel spills were not properly documented.

172.    This same dispersal procedure was also used at times when Defendants illegally dumped sewage and other waste into the Hudson River.

173.    Defendants also discharged hundreds of gallons of coolant into the waterways traversed by its vessels.

174.    The vessels' engines are cooled using a system of brass pipes running through the vessels' keel, which is the lowest point of the hull running from the bow to the stern. All of the vessel hulls were made of aluminum to reduce the weight of the vessel, but it also made them prone to rupturing when they struck partially submerged objects in the water.

175.    Damage to vessel hulls and the keel cooling system was a common and ordinary occurrence. When this happened, the cooling system would leak coolant into the water, losing up to 50 gallons in a single day.

176.    However, rather than remove the vessels and repair the cooling system leaks, mechanics such as Torres, and fuelers such as Khatchikian, were ordered to replenish the coolant reserve tanks each night. For example, Torres recalls adding a 55-gallon drum of coolant per night to both the Hudson and the Fulton vessels for extended periods of time.

177.    Typically, the vessels would not be taken out of service to repair the hull damage and coolant system leaks until shortly before Defendants got word that the Coast Guard would be coming for an inspection.

**E.  Other Pollutants, Including Batteries and Aluminum Shavings**

178.    Torres personally witnessed Defendants routinely discharge used batteries into the Hudson River from work docks.

179.    Torres also personally observed Defendants routinely discharge aluminum grindings, shavings, and millings into the Hudson River from work docks. This aluminum waste was generated by the various repairs performed on the vessels. This included both minor repairs

while the vessels were still in the water and major repairs performed while the vessel was on the lift or dry-docked.

180.    These discharges not only introduced toxic materials into the Hudson River, but they also created physical hazards to navigation.

**F.  Defendants Received Loan and Grant Monies They Were Not Entitled To**

181.    Defendants received loan and grant monies from state and federal programs, including from the Department of Transportation, Federal Highway Administration, Federal Maritime Administration, Federal Emergency Management Agency, and New Jersey Transit.

182.    Upon information and belief, in order for Defendants to receive and retain these loan and grant monies, they had an obligation to comply with any and all environmental laws. Moreover, as part of the application and disbursement processes for the loans and grants, Defendants were required to, and did, affirm and/or certify that they were in compliance with all environmental laws and that they intended to remain in compliance.

183.    The non-exhaustive charts below illustrate that Defendants received millions of dollars from state and federal agencies based upon a false representation that Defendants complied with all environmental laws, including APPS, CWA, and NJWPCA. Some of the monies received include:

| Monies to Defendants from the Federal Highway Administration | | |
| --- | --- | --- |
| YEAR | RECIPIENT | AMOUNT RECEIVED |
| 2016 | NYW | $1,166,844 |
| 2016 | Billybey | $1,080,748 |
| 2017 | Billybey | $1,056,040 |
| 2017 | NYW | $1,140,021 |

| 2018 | NYW | $1,049,025 |
| 2019 | NYW | $1,000,181 |

| Monies to Defendants from the Federal Emergency Management Agency | | |
| YEAR | RECIPIENT | AMOUNT RECEIVED |
| 2015 | Billybey | $120,367 |
| 2015 | Port Imperial | $33,750 |
| 2016 | Billybey | $262,125 |
| 2016 | Port Imperial | $227,955 |

| Monies to Defendants from New Jersey Transit | | |
| YEAR | RECIPIENT | AMOUNT RECEIVED |
| | NYW | $2,500,000 |

### G.  Khatchikian's Retaliatory Termination

184.    In the summer of 2015, Khatchikian began to voice his concerns more formally and refused to participate in Defendants' fraudulent conduct.

185.    Despite years of exemplary performance, Khatchikian was suspended for two days, on July 1 and 2, 2015, for allegedly leaving a fuel nozzle unattended, which Defendants characterized as causing a "major fuel spill."

186.    As alluded to above, the cause of the incident was because a secondary valve had been left open going to the second of two vessels that Khatchikian was sequentially fueling, which resulted in fuel spilling into the Hudson River.

187.    At the time of the incident, the fueling logistics at the NYW Work Dock were complicated and impossible for a single fueler to adequately monitor. The logistics include having to first load the fuel truck from the underground diesel storage tanks located near the NYW Goldman Dock, then park the fuel truck near the NY Work Dock and connect the truck's hose to the fuel line leading to each work barge. On each work barge there is a fuel dispensing juncture with a main shutoff valve, and individual shutoff valves for each of the final dispensing hoses (2 at the first barge, and 3 at the second barge).

188.    In order to efficiently fuel such a large number of vessels at the NYW Work Dock, after connecting the fuel truck to the dock fuel line, the fueler would: set the final dispensing hose in the second boat to be sequentially filled; then go back and start the fuel truck and its pump; then set the dispensing hose into the first boat to be fueled; then go to the juncture on the barge and open the main valve and the valve for the dispensing hose to the first boat being fueled; and then walk over to the first boat being fueled to monitor the fueling process, including ensuring that the nozzle was not dislodged if the boat rocked. Unfortunately, the fuel hose nozzles that went into the boats' fuel tank inlet were not ideally suited for safely dispensing hundreds of gallons of fuel into unstable boats, especially by a single fueler who had to monitor and attend to all aspects of a complicated fueling set-up.

189.    On July 8, 2015, IAM union representative Juan Negron met with Alan Warren, Burt Trebour, and Mayda Whelan concerning this incident and Defendants' intended 5-day suspension of Khatchikian.

190.    After the July 8, 2015, meeting, Defendants not only waived the remaining three days of Khatchikian's suspension, they also hired a fueling assistant to help monitor the fuel truck, the fuel junctures on the work barges, and otherwise provide help during fueling operations.

191.    Khatchikian welcomed the help, and developed a routine that involved using his cell phone to communicate with the fueling assistant during the fueling process.

192.    A few weeks later, in early August 2015, Khatchikan called Assistant Manager Jeffrey Veit and explained that he refused to improperly discharge sewage into the river from one of the Goldman Sachs boats (York or Jersey) telling him words to the effect, "I don't want to get caught dumping shit into the river." Khatchikian believed Defendants' discharge procedures were illegal.

193.    Shortly after, on August 17, 2015, Khatchikian was terminated. Defendants' termination letter, dated August 19, 2015, indicated it was due to his failure to "follow procedures" in the refueling of vessels.

194.    Defendants' August 19, 2015, termination letter to Khatchikian began by noting his prior 2-day suspension for leaving a "fuel nozzle unattended" on June 30, 2015.

195.    The letter then claimed that, even after the July 8, 2015 meeting, Defendants had observed him "on numerous occasions violating the very same protocols" by "fueling multiple vessels at the same time which requires the shut off nozzle be pinned to permit the continuous flow of diesel fuel," and being "inattentive" on his cell phone while fueling a vessel.

196.    Importantly, prior to the June 30, 2015 fuel spill, for which Khatchikian had already served a two-day suspension, he had never been written up or otherwise disciplined for any violation of company policy.[18] Moreover, the remaining three days of his suspension for the fuel spill incident had already been waived, and Defendants offered no hard evidence that he subsequently fueled multiple vessels simultaneously and in an unsafe manner.

_____

[18] According to NYW's polices, typically an employee must be written up three times before termination is considered.

197.    Khatchikian was also told that Defendants had seen photos and videos of his alleged failure to follow fueling procedures after the July 8, 2015 meeting, but his requests to see the footage were denied.

198.    Defendants refusal to produce the purported video footage is not surprising, since it would have shown that Khatchikian was using his phone to communicate to his new fueling assistant during the fueling process. Video footage would have also shown that Khatchikian was using acceptable protocols for *sequentially* refueling multiple vessels in an efficient and safe manner, rather than simultaneously fueling multiple vessels as Defendants wrongly accused in their termination letter.

199.    Khatchikian's termination in mid-August came a full six weeks after the fuel spill incident had been put to rest, and without any intervening write-ups concerning his fueling process. Notably, however, Khatchikian was terminated shortly after his early August statements to Veit about no longer being willing to dump raw sewage into the Hudson River using the "Mafioso" pump.

200.    Just like the three fuelers before him, as soon as Khatchikian complained about Defendants' policy and practice of using the Mafioso pump to dump hundreds of gallons of raw sewage into the Hudson River every night, Defendants terminated him using a fabricated justification that characterized him as untrustworthy.

201.    Khatchikian had planned to continue to grow with NYW, with goals of becoming a Captain or even a manager—but his dreams were dashed when he chose to speak out about Defendants' illegal dumping practices.

202.    Even more, he lost the opportunity to provide for his children and be the role model for them he believed a position as captain or manager could create. Defendants' retaliatory

termination has caused Khatchikian to lose sleep, experience difficulty concentrating, and suffer increased stress and anxiety about how he will provide financially for his family. Shortly after the termination, the undue stress caused Khatchikian to experience pains in his chest in neck and, later, migraines. Khatchikian had never experienced these types of symptoms prior to his unlawful termination.

### c.  Khatchikian's Post Termination Investigation

203.    Due to Khatchikian's concerns about Defendants' illegal conduct, even after his retaliatory termination, he continued his investigation into Defendants' illegal conduct.

204.    On June 25, 2018, at approximately 21:24 hours, Khatchikian's investigation found oil was discharged into the river.

205.    On June 27, 2018, at approximately 15:32 hours, Khatchikian's investigation found during service of the vessel Patriot, oil was discharged into the river.

206.    On September 23, 2018, at approximately 23:14 hours, Khatchikian's investigation found a vessel was discharging pollutants into the river, resulting in a large volume of soap suds forming in the water for approximately 15 minutes.

207.    On October 2, 2018, based in part upon information provided by Plaintiffs/Relators, the EPA placed a dye lot into the sewage holding tank of one of the vessels, the Bayonne, being serviced by NYW in order to show the later discharge of raw sewage in the river being done.

208.    On October 3, 2018, at approximately 04:15 hours, Khatchikian's investigation, which includes video footage, found the vessel Bayonne's sewage was discharged into the river. The video shows an employee looking into the river and apparently noticing the fluorescent dye spreading across the surface of the Hudson River. The video then shows the employee acting odd, running back and forth, and the vessel being put into gear at a high speed in several approximately

17-second intervals, seemingly to disperse the sewage discharged. Immediately after this incident, NYW took the Bayonne out of service, its GPS device was turned off, and the vessel was moved to Haverstraw, New York.

209.    On October 14, 2018, at approximately 22:17 hours, Khatchikian's investigation found that oil from the vessel Patriot was discharged into the river.

210.    On October 22, 2018, at approximately 13:51 hours, Khatchikian's investigation found that oil had been discharged from the vessel York into the river and further that pollutant- and oil-soaked absorbent pads were tossed into the river.

211.    On about October 29, 2018, the EPA returned to place dye lots in the sewage holding tanks of some of Defendants' vessels, but were thwarted because the bathrooms were either locked (the Stevens, Patriot, and Brooklyn) or the toilets were actually removed from the vessel (the Hoboken, whose toilet was earlier removed within days of Defendants' receiving a letter from Plaintiffs/Relators' counsel providing notice of violations under the CWA).

## VI.    CONCLUSION

212.    Defendants' conduct outlined above violates the federal FCA and the New Jersey FCA by failing to pay monies owed to the government in the form of statutory penalties, damages, clean-up costs, and disgorgement of economic benefits derived from its routine discharge of pollutants, sewage, oil, and other hazardous substances into the Hudson River, East River, Upper New York Bay, Lower New York Bay, and Raritan Bay. For each instance of Defendants' illegal discharge, they are subject to a mandatory fine between $5,000 and $250,000. By covering up the illegal discharges, Defendants avoided their obligation to the United States and the State of New Jersey the statutory penalties, damages, clean-up costs, and disgorgement of economic benefits required by the FRA, CWA, MARPOL/APPS, and or NJWPCA.

213.     Defendants are also liable under the federal FCA and New Jersey FCA because they improperly obtained loan and grant monies from state and federal programs, including from the Department of Transportation, Federal Highway Administration, Federal Maritime Administration, Federal Emergency Management Agency, and New Jersey Transit, based on their false representations that they complied with all environmental laws.

214.     Defendants' conduct described above violates the FRA, which prohibits the discharge of oil and other navigation hazards into the navigable waters of the United States. In addition to the discharge of oil, fuel, and lubricants, Plaintiffs/Relators regularly observed large marine batteries and aluminum debris being discharged into the Hudson River. Defendants' illegal discharges subject them to liability for a fine of $25,000 per day.

215.     Defendants' conduct described above violates the CWA, which prohibits the discharge of pollutants, sewage, oil, or hazardous substances into the navigable waters of the United States. In addition to the discharge of oil, Plaintiffs/Relators regularly observed raw sewage, coolant, fuel, lubricants, and other pollutants being discharged into the Hudson River. Defendants used a portable sewage pump and short hoses to pump raw sewage and pollutants directly into the Hudson River, rather than properly disposing of them. Examples of this can be seen in the photographs above. Defendants' illegal discharges result in a fine between $2,000 and $25,000 for each instance, or of not less than $100,000 if the discharges were a result of gross negligence.

216.     Defendants' conduct described above violates MARPOL and APPS, each of which prohibits the discharge of oil, oily water mixtures, garbage, and other hazardous substances into the navigable waters of the United States. Plaintiffs/Relators regularly observed that oil and fuel were discharged into the Hudson River by Defendants, in some instances hundreds of gallons.

Rather than properly clean, document, and report these incidents, Defendants would cover up the discharge by "dispersing" the oily water mixture by revving the engines of the vessel while docked. Each instance of Defendants' illegal discharges results in a mandatory fine not to exceed $25,000 or, if done knowingly, a mandatory fine of not more than $50,000.

217.    Defendants' conduct described above violates the NJWPCA, which prohibits the discharge of pollutants, sewage, oil, or hazardous substances into the navigable waters of the United States. In addition to the discharge of oil, Plaintiffs/Relators regularly observed raw sewage, fuel, lubricants, coolant, and other pollutants being discharged into the Hudson River. Defendants used a portable sewage pump and short hoses to pump sewage and pollutants directly into the Hudson River, rather than properly disposing of them. Examples of this can be seen in the photographs above. Defendants' illegal discharges result in a fine not to exceed $50,000 per day of each such violation, or between $25,000 and $250,000 for each instance, if the discharges were done purposely, knowingly, or recklessly and caused a significant adverse environmental effect.

218.    When Khatchikian spoke out against Defendants' illegal discharging, Defendants retaliated against him and terminated his employment in violation of the FCA and the NJSA.

219.    Defendants have knowingly discharged thousands of gallons of sewage, pollutants, and oil into a river used for recreation and home to numerous species of marine life. As a result, Defendants have caused significant harm to the environment, the State of New Jersey, and the United States government.

### *FIRST COUNT*
### *VIOLATION OF THE FEDERAL FALSE CLAIMS ACT*

220.    Relators reallege paragraphs 1 through 219 of this First Amended Complaint.

221.    Relators seeks relief against the various Defendants pursuant to the False Claims Act, 31 U.S.C. § 3729(a) *et seq*.

222.    By the acts described above, Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

223.    By the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

224.    The United States paid or provided monies to Defendants in the form of grants, loans, payments, subsidies or the like because of Defendants' misrepresentations that they were in compliance, and would remain in compliance, with all environmental laws including, but not limited to, the FRA, CWA, APPS, and NJWPCA.

225.    By the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, including, without limitation, the payment of statutory penalties and damages under the FRA, CWA, and APPS, all in violation of 31 U.S.C. § 3729(a)(1)(G).

226.    By reason of Defendants' actions, the United States has sustained damages, and continues to sustain damages, in an amount to be determined at trial.

227.    By reason of Defendants' actions, Defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the Court for each and every violation, not to exceed $23,331.[19]

---

[19] Depending on the dates of the violations, the FCA civil penalties ranges are as follows:

| FCA Civil Penalty - Effective Dates | Minimum | Maximum |
|---|---|---|
| June 20, 2020 – | $11,665 | $23,331 |

228.    Defendants are obligated to pay treble damages pursuant to the Act.

## *SECOND COUNT*

## *CONSPIRACY TO VIOLATE THE FEDERAL FALSE CLAIMS ACT*

229.    Relators reallege paragraphs 1 through 219 of this First Amended Complaint.

230.    By the acts described above, Defendants knowingly conspired to commit a violation of 31 U.S.C. § 3729(a)(1)(A), (B) and (G), all in violation of 31 U.S.C. § 3729(a)(1)(C).

231.    By Defendants' conspiracy described above, the United States paid or provided monies to Defendants in the form of grants, loans, payments, subsidies or the like, because of Defendants' false misrepresentations about their intent to comply, and/or ongoing compliance, with all relevant laws including, but not limited to, the FRA, CWA, APPS, and NJWPCA.

232.    In addition, and as set forth in the preceding paragraphs, Defendants have further conspired with each other to defraud the United States when they knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, including, without limitation, the payment of statutory penalties under the FRA, CWA, APPS, and NJWPCA.

233.    By reason of Defendants' misconduct, the United States has sustained damages, and continues to sustain damages, in an amount to be determined at trial.

| | | |
|---|---|---|
| March 1, 2019 – June 19, 2020 | $11,463 | $22,927 |
| January 15, 2018 – February 28, 2019 | $11,181 | $22,363 |
| February 3, 2017 – January 14, 2018 | $10,957 | $21,916 |
| August 1, 2016 – February 2, 2017 | $10,781 | $21,563 |
| August 1999 – August 1, 2016 | $5,500 | $11,000 |
| 1986 – August 1999 | $5,000 | $10,000 |

234.    By reason of Defendants' misconduct, Defendants should be obligated to pay, pursuant to the provisions of the False Claims Act, a penalty amount to be determined by the Court for each and every violation, not to exceed $23,331.

235.    By reason of Defendants' misconduct, Defendants are obligated to pay treble damages pursuant to the Act.

## *THIRD COUNT*
### *NEW JERSEY FALSE CLAIMS ACT*

236.    Relators reallege paragraphs 1 through 219 of this First Amended Complaint.

237.    Relators seek relief against the various Defendants pursuant to the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq*.

238.    By the acts described above, Defendants knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in violation of N.J.S.A. § 2A:32C-3(a).

239.    By the acts described above, Defendants knowingly made or used a false record or statement to get a false or fraudulent claim paid in violation of N.J.S.A. § 2A:32C-3(b).

240.    The State of New Jersey paid or provided monies to Defendants in the form of grants, loans, payments, subsidies, or the like because of Defendants' misrepresentations that they were in compliance, and would remain in compliance, with all environmental laws including, but not limited to, the FRA, CWA, APPS, and NJWPCA.

241.    In addition, and as set forth in the preceding paragraphs, Defendants are liable to the State because they either had possession, custody, or control of public property and money used or to be used by the State of New Jersey and knowingly delivered or caused to be delivered to the State less than the full amount, or knowingly made, used, or caused to made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or

66

property to the State of New Jersey, including, without limitation, the payment of statutory penalties and other amounts for violations of the NJWPCA, all in violation of N.J.S.A. § 2A:32C-3(d) & (g).

242.   By reason of Defendants' misconduct, the state of New Jersey has sustained damages, and continues to be damaged, in an amount to be determined at trial.

243.   By reason of Defendants' misconduct, Defendants should be obligated to pay, pursuant to the provisions of the New Jersey False Claims Act, a penalty amount to be determined by the Court for each and every violation, not to exceed $23,331.

244.   Defendants are obligated to pay treble damages pursuant to the NJFCA.

### FOURTH COUNT
### CONSPIRACY TO VIOLATE OF THE NEW JERSEY FALSE CLAIMS ACT

245.   Relators reallege paragraphs 1 through 219 of this First Amended Complaint.

246.   By the acts described above, Defendants knowingly conspired to commit a violation of N.J.S.A. § 2A:32C-3(a), (b), and (g), all in violation of N.J.S.A. § 2A:32C-3(c).

247.   By Defendants' conspiracy described above, the State of New Jersey paid or provided monies to Defendants in the form of grants, loans, payments, subsidies, or the like, because of Defendants' false misrepresentations about their intent to comply, and/or ongoing compliance, with all relevant laws including, but not limited to, the FRA, CWA, APPS, and NJWPCA.

248.   In addition, and as set forth in the preceding paragraphs, by Defendants' conspiracy described above, Defendants are liable to the State because they either had possession, custody, or control of public property and money used or to be used by the State of New Jersey and knowingly delivered or caused to be delivered to the State less than the full amount, or knowingly made, used, or caused to made or used a false record or statement to conceal, avoid, or decrease an obligation

67

to pay or transmit money or property to the State of New Jersey, including, without limitation, the payment of statutory penalties and other amounts for violations of the NJWPCA, all in violation of N.J.S.A. § 2A:32C-3(d) & (g).

249.    By reason of Defendants' misconduct, the United States has sustained damages, and continues to sustain damages, in an amount to be determined at trial.

250.    By reason of Defendants' misconduct, Defendants should be obligated to pay, pursuant to the provisions of the NJFCA, a penalty amount to be determined by the Court for each and every violation, not to exceed $23,331.

251.    By reason of Defendants' misconduct, Defendants are obligated to pay treble damages pursuant to the NJFCA.

### *FIFTH COUNT*

### *VIOLATION OF THE ACT TO PREVENT POLLUTION FROM SHIPS (APPS)*
### *33 U. S. C. § 1901 et. seq.*

252.    Plaintiffs reallege paragraphs 1 through 219 of this First Amended Complaint.

253.    Plaintiffs bring this count pursuant to 33 U.S.C. § 1910, as persons adversely affected by violations of APPS.

254.    The 1973 International Convention for the Prevention of Pollution from Ships and the protocol of 1978 relating to the International Convention for the Prevention of Pollution from Ships (collectively known as MARPOL) is an international treaty implemented in the United States by the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § 1901 *et seq*.

255.    The APPS makes it a crime for any person to knowingly violate MARPOL, APPS, or the federal regulations promulgated under APPS. The regulations, promulgated by the Coast Guard, apply to all commercial vessels when operating in United States waters while at work or terminal under the jurisdiction of the United States. 33 C.F.R. § 151.09.

68

256.     MARPOL specifically addresses the prohibition regarding the discharge of sewage and oil or petroleum products. In addition to addressing the prohibition regarding discharge, MARPOL also requires the documentation of any discharge. The documentation is to include an indication regarding the facts and circumstances surrounding any discharge; the notation is to be signed by the person in charge of the operation, usually the Chief Engineer; and each page must be signed by the Master of the Ship. This documentation is to be maintained for regular inspection by the United States Coast Guard.

257.     33 U.S.C. § 1908 provides for the penalties for violation. Each discharge is considered a separate penalty. In addition to a determination of a fine, the person committing a violation of MARPOL commits a class D felony.

258.     33 U.S.C. § 1908(a) provides that the Court may pay to the person giving information leading to conviction not more than half of any fine paid.

259.     A violation of the MARPOL protocol renders an individual liable to the United States for a civil penalty not to exceed $25,000 for each violation or, if done knowingly, a mandatory fine of not more than $50,000. Each day of a continuing violation constitutes a separate violation.

260.     By reason of these violations, Defendants should be obligated to pay penalties, fines, attorney's fees, costs, and interest in the amount to be determined at the time of trial.

### *SIXTH COUNT*
### *VIOLATION OF THE FEDERAL WATER POLLUTION PREVENTION AND CONTROL ACT (CWA) 33 U.S.C. § 1251 et. seq.*

261.     Plaintiffs reallege paragraphs 1 through 219 of this First Amended Complaint.

262.     Plaintiffs bring this count pursuant to 33 U.S.C. § 1365, as persons adversely affected by violations of the CWA.

263.    The CWA was enacted to restore and maintain the chemical, physical, and biological integrity of the nation's waters. The CWA prohibits the discharge of harmful substances into the navigable waters and contiguous zone of the United States and, if it may affect natural resources, the exclusive economic zone belonging to the United States, except where permitted under MARPOL.

264.    Defendants have separately and in concert discharged harmful substances into the navigable waters of the United States, to wit: the Hudson River, East River, Upper New York Bay, Lower New York Bay, and Raritan Bay.

265.    As a result of Defendants' conduct, the United States has been damaged and the waterways negatively affected.

266.    Defendants' illegal discharges result in a fine between $2,000 and $25,000 for each instance, or of not less than $100,000 if the discharges were a result of gross negligence.

267.    By reason of these violations, Defendants should be obligated to pay penalties, fines attorney's fees, costs, and interest in the amount to be determined at the time of trial.

### *SEVENTH COUNT*
### *VIOLATION OF THE NEW JERSEY RICO*

268.    Plaintiffs reallege paragraphs 1 through 219 of this First Amended Complaint.

269.    Plaintiffs are each a "person" as defined by N.J.S.A. § 2C:41-1(b).

270.    Defendants are "persons" as defined by N.J.S.A. § 2C:41-1(b).

271.    During the applicable period, "Port Imperial Ferry Corporation," including but not limited to each of the individual offices, constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1(c).

272.   During the applicable period, "Port Imperial Ferry Corporation d/b/a NY Waterway," including but not limited to each of the individual offices, constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1(c).

273.   During the applicable period, "Romulus Development Corp.," including but limited to each of the individual offices, constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1(c).

274.   During the applicable period, Arthur Imperatore is a person as that term is defined in N.J.S.A. § 2C:41-1(b).

275.   During the applicable period, Alan Warren is a person as that term is defined in N.J.S.A. § 2C:41-1(b).

276.   An association-in-fact between Port Imperial Ferry Corporation and Port Imperial Ferry Corporation d/b/a NY Waterway constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1 *et seq*. and as outlined in the applicable paragraphs under "Factual Allegations."

277.   An association-in-fact between Port Imperial Ferry Corporation and Arthur Imperatore constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1 *et seq*. and as outlined in the applicable paragraphs under "Factual Allegations."

278.   An association-in-fact between Port Imperial Ferry Corporation and Alan Warren constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1 *et seq*. and as outlined in the applicable paragraphs under "Factual Allegations."

279.   An association-in-fact between Port Imperial Ferry Corporation d/b/a NY Waterway and Arthur Imperatore constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1 *et seq*. and as outlined in the applicable paragraphs under "Factual Allegations."

280.    An association-in-fact between Port Imperial Ferry Corporation d/b/a NY Waterway and Alan Warren constituted an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1 *et seq*. and as outlined in the applicable paragraphs under "Factual Allegations."

281.    An association-in-fact between Port Imperial Ferry Corporation, Port Imperial Ferry Corporation d/b/a NY Waterway, Arthur Imperatore and Alan Warren, jointly, severally, or in combination of some, constitutes an "enterprise" as that term is defined in N.J.S.A. § 2C:41-1 *et seq*. and as outlined in the applicable paragraphs under "Factual Allegations."

282.    As set forth in the foregoing paragraphs, Port Imperial Ferry Corporation engaged in a "pattern of racketeering activity" as that term is defined in N.J.S.A. § 2C:41-1(d)(1) and as outlined in the applicable paragraphs under "Factual Allegations."

283.    As set forth in the foregoing paragraphs, Port Imperial Ferry Corporation d/b/a NY Waterway engaged in a "pattern of racketeering activity" as that term is defined in N.J.S.A. § 2C:41-1(d) and as outlined in the applicable paragraphs under "Background Facts."

284.    As set forth in the foregoing paragraphs, Arthur Imperatore engaged in a "pattern of racketeering activity" as that term is defined in N.J.S.A. § 2C:41-1(d) and as outlined in the applicable paragraphs under "Factual Allegations."

285.    As set forth in the foregoing paragraphs, Alan Warren engaged in a "pattern of racketeering activity" as that term is defined in N.J.S.A. § 2C:41-1(d) and as outlined in the applicable paragraphs under "Factual Allegations."

286.    All of the Plaintiffs have been damaged in their business or property by reason of Defendants' violation of N.J.S.A. § 2C:41-2.

287.    Defendants' conduct violated applicable provisions of New Jersey Statutes, the New Jersey Administrative Code, the federal statutes pled herein, and/or the Code of Federal Regulations.

288.    Plaintiffs bring this action pursuant to N.J.S.A. § 2C:41-1 *et seq*. and in accordance therewith, seek statutory treble damages, attorney's fees, filing fees, and court costs.

### EIGHTH COUNT
### RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT

289.    Plaintiff Khatchikian realleges paragraphs 1 through 219 of this First Amended Complaint.

290.    No later than, and as early as, August 2015, Khatchikian engaged in protected conduct as that term is defined by the Federal False Claims Act, and other statutes, rules, codes, or other protections.

291.    Khatchikian was unlawfully threatened, disciplined, and discharged by Defendants in retaliation for lawful acts done by him on behalf of the United States and the general public in furtherance an action under this section or other efforts to stop one or more violations of the False Claims Act. Defendants violated 31 U.S.C. § 3730(h) when they retaliated against Khatchikian for exercising his rights under the False Claims Act.

292.    Defendants terminated Khatchikian as a result of his protected conduct on August 17, 2015.

293.    Defendants' retaliatory conduct violates the Federal False Claims Act, the New Jersey False Claims Act, and other statutes, rules, codes, or other protections.

294.    As a direct result of Defendants' unlawful retaliatory termination, Khatchikian has been damaged for which he is entitled to relief under 31 U.S.C. § 3730(h)(2).

### NINTH COUNT

### *RETALIATION IN VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT*

295.    Plaintiff Khatchikian realleges paragraphs 1 through 219 of this First Amended Complaint.

296.    No later than, and as early as, August 2015, Khatchikian engaged in protected conduct as that term is defined by the New Jersey False Claims Act and other statutes, rules, codes, or other protections.

297.    Khatchikian was unlawfully threatened, disciplined, and discharged by Defendants in retaliation for lawful acts done by him on behalf of the State of New Jersey and the general public in furtherance an action under this section or other efforts to stop one or more violations of the New Jersey False Claims Act. Defendants violated NJSA § 2A:32C-10 when it retaliated against him for exercising his rights under the New Jersey False Claims Act.

298.    Defendants terminated Khatchikian as a result of his protected conduct on August 17, 2015.

299.    Defendants' retaliatory conduct violates the New Jersey False Claims Act and other statutes, rules, codes, or other protections.

300.    As a direct result of Defendants' unlawful retaliatory termination, Khatchikian has been damaged for which he is entitled to relief under NJSA § 2A:32C-10 (c) and (d).

### *PRAYER FOR RELIEF*

WHEREFORE, the Plaintiffs/Relators, on behalf of themselves and the United States, the State of New Jersey, and other interested and affected persons, request that judgment be entered in their favor and against the various Defendants jointly and severally as follows:

a.    For each violation of the False Claims Act, 31 U.S.C. § 3729(a) e*t. seq.*, treble damages calculated in an amount to be determined at trial, plus the maximum statutory penalty for each violation, plus statutory attorneys' fees, expenses, and costs;

b.  For each violation of the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*, treble damages calculated in an amount to be determined at trial, plus the maximum statutory penalty for each violation, plus statutory attorneys' fees, expenses, and costs;

c.  For each violation of the APPS, Defendants should be obligated to pay the applicable fines, penalties, damages, clean-up costs, disgorgements, attorneys' fees, costs, expenses, and other allowable amounts, and the Court should issue an order enjoining Defendants from further violations of the APPS;

d.  For each violation of the CWA, Defendants should be obligated to pay the applicable fines, penalties, damages, clean-up costs, disgorgements, attorneys' fees, costs, expenses, and other allowable amounts, and the Court should issue an order enjoining Defendants from further violations of the CWA;

e.  On behalf of the Commissioner of Environmental Protection, the Court should enter a temporary injunction to stop Defendants' unlawful discharges under N.J.S.A. § 58:10A-10(c)(1);

f.  An award to Relators half of any and all fines paid by Defendants pursuant to 33 U.S.C. §§ 1908(a) and (b);

g.  An award of costs pursuant to N.J.S.A. § 2C:41-1 *et seq.* on all of the claims;

h.  Compensatory damages;

i.  An award to Plaintiff Khatchikian, with respect to his state and federal retaliation claims:

    a.  Two times the amounts of back pay that he would have had but for the retaliation, and interest on the back pay;

b. Compensation for all special damages, including emotional distress, sustained as a result of the retaliation and discharge, in an amount to be determined at trial;

c. Front pay in an amount to be determined at trial;

d. Punitive damages under N.J.S.A. § 2AC:32-10(c);

e. Litigation costs and reasonable attorneys' fees.

j. Any other applicable consequential, incidental, nominal and expectation damages;

k. Lawful interest, attorney's fees, filing fees, court costs, and such other and further relief as the Court shall deem equitable and just; and

l. An Order granting such other relief as this Court deems just and appropriate.

### *DESIGNATION OF TRIAL COUNSEL*

Pursuant to Rule 4:25-4, MICHAEL D. FITZGERALD, ESQUIRE is hereby designated as trial counsel for Plaintiffs/Relators in the above-captioned matter.

### *DEMAND FOR JURY TRIAL*

Plaintiffs/Relators, on behalf of themselves and the United States of America and the State of New Jersey, demand a jury trial on all claims alleged herein.

Dated: November  17, 2020

/s/ Michael D. Fitzgerald
Michael D. Fitzgerald, Esq.
NJ Bar #004391985
LAW OFFICES OF MICHAEL D. FITZGERALD
1701 Pennsylvania Ave, NW, Suite 200
Washington D.C. 20006
Tel: 703-888-5469
mdfitz@briellelaw.com

Gerald C. Robinson, Esq.
NJ Bar #028452005
HALUNEN LAW PLLC
80 South Eighth Street, Suite 1650
Minneapolis, MN 55402
Tel:  612-605-4098
Fax: 612-605-4099
robinson@halunenlaw.com

## ___CERTIFICATION OF SERVICE___

This is to certify that a copy of the foregoing will be served on the 17th day of November,

2020, via Federal Express Next Day Air, fee prepaid, to:


**William P. Barr, United States Attorney General**
**Department of Justice**
**950 Pennsylvania Avenue, N.W.**
**Washington, DC 20530-0001**

**Gurbir S. Grewal, New Jersey Attorney General**
**Office of the Attorney General**
**25 Market Street**
**Trenton, New Jersey 08611**

**David A. Dauenheimer, Assistant United States Attorney**
**Office of the United States Attorney**
**970 Broad Street, Room 700**
**Newark, New Jersey 07102**


/s/ Michael D. Fitzgerald
Michael D. Fitzgerald, Esq.