## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA AND STATE OF NEW JERSEY EX REL. RAFI KHATCHIKIAN AND IVAN TORRES**<br><br>**Plaintiffs/Relators,**<br><br>**v.**<br><br>**PORT IMPERIAL FERRY CORPORATION; PORT IMPERIAL FERRY CORPORATION d/b/a NY WATERWAY; ARTHUR IMPERATORE, President; ALAN WARREN, Vice President; ROMULUS DEVELOPMENT CORP.; BILLYBEY FERRY COMPANY, LLC; WILLIAM WACHTEL; ABC CORPORATIONS 1-10 (same names being fictitious) and JOHN DOES 1-10 (same names being fictitious),**<br><br>**Defendants** | Civ. No. 2:16-2388 (KM) (AME)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiffs Rafi Khatchikian and Ivan Torres were previously employed by Defendant Port Imperial Ferry Corporation d/b/a NY Waterway ("Port Imperial"), which operates a fleet of commercial ferries and multiple boat maintenance facilities. Plaintiffs, suing as relators under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, claim that Port Imperial and the other Defendants violated federal environmental laws by routinely dumping raw sewage, boat fuel, oil, and other materials into New Jersey's and New York's waterways. Further, they claim that Defendants violated both state and federal law by falsely certifying compliance with environmental regulations to obtain governmental grants and by terminating Khatchikian in retaliation for his complaints about the illegal pollution. Now before the Court is Defendants'

motion to dismiss the complaint for failure to state a claim, under Fed. R. Civ. P. 12(b)(6). (DE 19, 27.)[1] For the following reasons, the motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.   BACKGROUND

### A. Factual Allegations

Port Imperial is a Weehawken-based corporation that operates over thirty ferry vessels in multiple major waterways in New Jersey and New York, including the Hudson River, East River, New York Bay, and Raritan Bay. (Am. Compl. ¶¶ 1, 13, 105.) Its president and founder is Arthur Imperatore Sr. and its vice president is Alan Warren, both of whom are named as defendants in the instant suit. (*Id.* ¶¶ 14, 15.) Beginning in 2004, Port Imperial's fleet was partially owned by Defendant Billybey Ferry Company, LLC, a New Jersey company formed by William Wachtel to take over debt payments of approximately sixteen Port Imperial ferries. (*Id.* ¶¶ 16-18, 112.) Port Imperial continued to operate and maintain those sixteen ferries and ultimately acquired Billybey's assets in 2016.[2] (*Id.* ¶¶ 112-13.)

---

[1]   "DE __" refers to the docket entry numbers in this case.

"Am. Compl." refers to Plaintiffs' First Amended Complaint (DE 10)

"Port Imperial MTD" refers to the brief in support of Defendants' motion to dismiss filed by Defendants Port Imperial Ferry Corporation, Port Imperial Ferry Corporation d/b/a NY Waterway, Arthur Imperatore, Romulus Development Corp., and Billbey Ferry Company, LLC (DE 19)

"Warren MTD" refers to Defendant Alan Warren's brief in support of Defendants' motion to dismiss (DE 27)

"Op. to MTD" refers to Plaintiffs' Opposition to Defendants' Motion to Dismiss (DE 33)

"Port Imperial MTD Reply" refers to Port Imperial's reply brief in further support of Defendants' motion to dismiss (DE 36)

[2]   As part of this 2016 acquisition, Port Imperial entered into a leaseback agreement with Billybey that Billybey would collect revenue from two ferries while Port Imperial operated and maintained them. (Am. Compl. ¶ 114.)

Port Imperial also operates a ferry passenger terminal and two maintenance docks: a larger one ("the work dock") that provides maintenance, repairs, and refueling, and a smaller one ("the secondary dock") that provides refueling and "light maintenance" for Port Imperial's "premier" vessels. (*Id.* ¶¶ 13, 107, 110-11.) The work dock is located in Weehawken and sits on "water land" owned by Defendant Romulus Development Corporation, a company also owned by Imperatore. (*Id.* ¶¶ 13, 16, 109.)

Plaintiffs Khatchikian and Torres were both previously employed by Port Imperial at its maintenance docks. Khatchikian worked as a fueler from 2013 to 2015, while Torres worked as a fueler and mechanic from 2011 to 2015. (*Id.* ¶¶ 11, 12, 120-22, 124-25.) As detailed below, both allege that they witnessed Defendants' employees routinely dumping sewage, garbage, oil, fuel, and other pollutants into the Hudson River and other waterways in which Port Imperial's ferries operated. (*Id.* ¶ 3.) Indeed, they claim that they were instructed to dump these pollutants as part of their employment and were "expected to individually take the blame" if authorities ever discovered it. (*Id.* ¶¶ 34, 37, 116, 150-51, 153.) Ultimately, Khatchikian alleges, his employment was terminated after he notified supervisors and union management that available equipment was insufficient to properly dispose of raw sewage and that their method of disposing of vessels' sewage was illegal. (*Id.* ¶¶ 34, 141, 157-59.) Torres alleges that he was "compelled to terminate" his own employment after complaining about the pollution. (*Id.* ¶¶ 37, 160.)

Both before and after his termination, Khatchikian sought to observe and document Defendants' pollution. His observations, photographs, and videos constitute part of the factual basis of the complaint.

### 1. Illegal Discharge of Sewage

One of the duties of a fueler was to dispose of sewage from vessels. Both Khatchikian and Torres believed that the "proper" way to dispose of sewage was to connect vessels to an intake hose that emptied into the municipal sewage system. (Am Compl. ¶¶ 127, 129-32.)

However, plaintiffs maintain that Defendants had multiple routine practices for illegally dumping pollutants. First, dock workers would use either a stationary or portable pump to empty vessels' sewage directly into the Hudson River. (*Id.* ¶¶ 146-47, 150-51.) Second, some ferries were equipped with on-board pumps that would be used to pump out sewage when the ferries were in open water or when docked. (*Id.* ¶ 148.) Third, some ferries were equipped with a pipe under the vessel leading to the sewage holding tank that crewmembers would open while the ferry was in motion, allowing gravity and suction to empty sewage directly into the water. (*Id.* ¶¶ 117, 149.) Moreover, dock workers would also put the chemical "Aqua Kem" into the ferries' sewage tanks to reduce the sewage's odor when it was discharged, and they would run vessels' propellers to disperse the sewage once it was released into the Hudson. (*Id.* ¶¶ 144, 171-72.)

All told, Plaintiffs claim that this practice of pollution was a "nightly" routine at Port Imperial's work dock, and that it also occurred, though "not as common[ly,]" at Port Imperial's secondary maintenance dock.[3] (*Id.* ¶ 133.) Given the size of vessels' sewage holding tanks and the frequency of illegal dumping of sewage, Plaintiffs estimate that "Defendants could easily discharge over 2,000 gallons of raw sewage from 20 vessels directly into the Hudson River in a single day." (*Id.* ¶ 156.)

Plaintiffs allege that these illegal methods of dumping sewage were dictated by their supervisors and that Defendants were aware of these practices. (*Id.* ¶¶ 150-51, 153-54.) Plaintiffs allege that Port Imperial Vice President Alan Warren personally instructed Torres to illegally dump sewage into the Hudson River, stating "the Coast Guard isn't around, so just do what you gotta do." (*Id.* ¶ 162.) Indeed, Khatchikian states that on one occasion, he

---

[3]    Plaintiff's complaint also alleges that sewage was "sometimes" dumped at Port Imperial's passenger terminal when ferry vessels were moored there overnight. (Am. Compl. ¶ 147.)

observed Warren watching the illegal discharge of sewage in the Hudson River. (*Id.* ¶ 162.)

To further support these allegations, Plaintiffs provide numerous photographs that depict various Port Imperial vessels pumping brown-colored liquid into nearby water. (*Id.* ¶¶ 2, 150, 155.) Plaintiffs provide a non-exhaustive list of individual ferries allegedly involved in such pollution. (*See id.* ¶¶ 115-17, 119, 168.) Khatchikian also alleges that in October 2018, in part in response to information provided by Plaintiffs, the Environmental Protection Agency (EPA) placed fluorescent dye into the sewage holding tank of a Port Imperial vessel. (*Id.* ¶ 207.) The following day, Khatchikian observed Port Imperial employees discharging sewage into the Hudson River, as evidenced by fluorescent dye in the river water, and then using the boat's propeller to disperse the dyed sewage. (*Id.* ¶ 208.)

### 2. Illegal Discharge of Polluted Bilge Water

Khatchikian and Torres also maintain that they witnessed multiple Port Imperial ferries "routinely" discharge bilge water that was polluted with "oil, fuel, lubricants, and coolant" directly into the Hudson River. (Am. Compl. ¶ 167, 169.) To conceal the pollution in discharged bilge water, Port Imperial mechanics allegedly would mix bilge water with liquid detergent before discharging it, and then run a vessel's propellers to churn and disperse the water. (*Id.* ¶¶ 167-69, 171.) In support, they name the individual ferries involved in such pollution and provide first names or initials for mechanics said to have participated in these practices. (*See id.* ¶¶ 118, 168.) Additionally, Khatchikian states that after he left Port Imperial's employ, he observed the discharge of oil and other pollutants from Port Imperial vessels into the Hudson River on at least three separate occasions: June 25, June 27, and September 23, 2018. (*Id.* ¶¶ 204-06.)

### 3. Other Alleged Violations of Environmental Laws

Plaintiffs also allege, albeit more briefly, that Port Imperial illegally discharged other pollutants into nearby waterways, improperly disposed of

ship-related refuse, and tried to conceal their violations of environmental law from both government authorities and the public.

First, they alleged that Port Imperial's vessels dumped "hundreds of gallons of coolant" into the waterways they used. (Am. Compl. ¶ 173.) They claim that when vessels were damaged—a "common and ordinary occurrence"—and leaking coolant, Defendants would ask mechanics and fuelers, including Plaintiffs, to regularly replenish the coolant but would avoid getting the vessels repaired until they were informed of an impending Coast Guard inspection. (*Id.* ¶¶ 174-77.)

Second, they state that Torres witnessed Defendants routinely polluting the Hudson River with used batteries and aluminum shavings while repairing Port Imperial's vessels at both maintenance docks. (*Id.* ¶¶ 178-80.) No further detail is given.

Third, they maintain that Defendants "failed to follow proper disposal procedures" for oil filters and fuel filters. (*Id.* ¶ 165.) In support of this claim, they provide a photograph dated March 14, 2015, that purportedly depicts used oil filters in a dumpster. (*Ibid.*)

Finally, Plaintiffs state that defendants aimed to hide their environmental violations, for instance by concealing oil and fuel filters that they improperly disposed of in black plastic garbage bags. (*Id.* ¶ 3.) In another instance, Khatchikian claims that he accidentally caused a fuel spill of "somewhere between 300 and 350 gallons of fuel" in the Hudson River and notified Warren, who told him that "if anybody asks," he should report that the spill was between 30 and 60 gallons. (*Id.* ¶¶ 170, 185-86.)

### 4. Loans and Grants Received by Defendants

Plaintiffs also claim that Defendants obtained money from state and federal programs which, "[u]pon information and belief," required Defendants to certify compliance with "any and all environmental laws," which certification would have been false. (Am. Compl. ¶¶ 181-82.) In support, Plaintiffs provide a list of funds received by Defendants between 2016 and 2019 from the Federal

Highway Administration ("FHWA"), Federal Emergency Management Agency ("FEMA"), and New Jersey Transit Corporation ("NJ Transit"). (*Id.* ¶ 183.)

### 5. Khatchikian's Termination

Plaintiffs' complaint alleges that in the summer of 2015, Khatchikian began complaining about, and refusing to participate in, Defendants' dumping of pollutants. (Am. Compl. ¶ 184.) Then, on June 30, 2015, Khatchikian caused a fuel spill, leading to his two-day suspension from work. (*Id.* ¶¶ 170, 185-86.) Afterwards, Port Imperial hired a fueling assistant to aid Khatchikian in his duties. Khatchikian states that he would communicate with this assistant via cellphone while they were working in separate areas of the docks. (*Id.* ¶¶ 190-91.)

Subsequently, Khatchikian contacted an assistant manager at Port Imperial and told him that he would no longer dump sewage from Port Imperial vessels into the river. (*Id.* ¶ 192.) He was terminated a few weeks later for failing to "follow procedures" in the refueling of vessels, for his role in the prior fuel spill, and for being "inattentive" by using his cell phone while working. (*Id.* ¶¶ 193-95.) Prior to the fuel spill, Khatchikian claims he "had never been written up or otherwise disciplined for any violation of company policy." (*Id.* ¶¶ 196, 199.)

### B. Procedural History

Plaintiffs filed the operative first amended complaint on November 17, 2020, alleging that Defendants (1) violated and conspired to violate the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* (Counts 1 and 2); (2) violated and conspired to violate the New Jersey False Claims Act ("NJFCA"), N.J. Stat. Ann. § 2A:32C-1 *et seq.* (Counts 3 and 4); (3) violated the Federal Water Pollution Prevention and Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 *et seq.* (Count 6); and (4) violated the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), N.J. Stat. Ann. § 2C:41-1 *et seq.* (Count 7) (DE 10; Am. Compl. ¶¶ 220-51, 261-88.) Additionally, Plaintiffs claim

that Port Imperial retaliated against Khatchikian in violation of the FCA, 31 U.S.C. § 3730(h) (Count 8).[4] (Am. Compl. ¶¶ 289-94; Op. to MTD at xi.)

On April 2, 2021, Defendants Port Imperial, Arthur Imperatore, Romulus Development Corp., and Billbey Ferry Company, LLC filed a motion to dismiss Plaintiffs' first amended complaint, arguing that (1) Plaintiffs failed to state claims under the FCA, NJFCA, and NJRICO, or for retaliation; (2) Plaintiffs failed "to allege liability on behalf of the individual defendants"; and (3) this Court lacks subject matter jurisdiction over Plaintiffs' CWA claims. (DE 19.) Defendant Alan Warren filed a motion to dismiss on May 23, 2021, which the other Defendants joined, similarly arguing that Plaintiffs failed to state viable, plausible claims in their complaint. (DE 27, 28.)

## II.    DISCUSSION AND ANALYSIS

### A. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), the Court may dismiss a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). On such a motion, the well-pleaded factual allegations of the complaint must be taken as true, with all reasonable inferences drawn in plaintiff's favor. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of [his] 'entitlement to relief requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also* Fed. R. Civ. P. 8(a)(2) (requiring a complaint to plead "a short and plain statement of the claim showing that the pleader is entitled to relief"). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, demonstrating that it is

---

[4]    Plaintiffs' first amended complaint also alleged that defendants violated the federal Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901 *et seq.*, and retaliated against Khatchikian in violation of the NJFCA. (Am. Compl. ¶¶ 252-60, 295-300.) However, they withdrew those claims on July 16, 2021. (DE 33.)

"plausible on its face." *See Twombly*, 550 U.S. at 570; *see also Umland v. PLANCO Fin. Servs.*, Inc., 542 F.3d 59, 64 (3d Cir.2008). This entails "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.* at 678. Stated differently, in reviewing the well-pleaded factual allegations and assuming their veracity, this Court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

Further, for claims sounding in fraud, Fed. R. Civ. P. 9(b) imposes a heightened pleading requirement, over and above that of Rule 8(a): "[I]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). This rule requires pleadings that put a defendant "on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

## B. False Claims Act and New Jersey False Claims Act (Counts 1-4)

The FCA imposes liability on any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of subparagraph (A), (B), . . . [or] (G).

. . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

31 U.S.C. § 3729(a)(1)

9

A private plaintiff (or relator) may bring a civil action on behalf of the United States to enforce the FCA and may receive a share of any recovery resulting from the lawsuit. 31 U.S.C. § 3730(b), (d); *United States ex rel. Freedom Unlimited, Inc. v. City of Pittsburgh, Pennsylvania*, 728 F. App'x 101, 102 n.2 (3d Cir. 2018). To establish a cause of action under the FCA, a plaintiff must allege "four elements: falsity, causation, knowledge, and materiality." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017) (citing *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 136 S. Ct. 1989, 1996 (2016) and *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 304-05 (3d Cir. 2011)). Under section 3729(a)(1)(G), appellate courts have also required a showing "that the defendant had a financial obligation to the federal government" for liability to attach. *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 249 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1296 (2020); *see also, e.g.*, *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017). A plaintiff's claim for conspiracy under Section 3729(a)(1)(C) is contingent on a violation "of subparagraph (A), (B), . . . [or] (G)"; "[w]ithout an underlying violation, there can be no liability for conspiracy under the FCA." *United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 317 n.3 (D.N.J. 2015), *aff'd*, 855 F.3d 481 (3d Cir. 2017); *see also United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 n.53 (3d Cir. 2017) ("[T]here can be no liability for conspiracy where there is no underlying violation of the FCA." (quotation marks and citation omitted)).

In the context of an FCA claim, Rule 9(b) requires that a relator alleging fraud must "support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Securities Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). Under that heightened pleading standard, relators need not identify a specific claim for payment, but they "must provide 'particular

details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157-58 (3d Cir. 2014) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). Indeed, "the possibility of a legitimate explanation undermines the strength of the inference" that submitted claims were illegal, and "describing a mere opportunity for fraud will not suffice." *United States v. Omnicare, Inc.*, 903 F.3d 78, 91-92 (3d Cir. 2018) (quoting *Foglia*, 754 F.3d at 157-58).

The New Jersey False Claims Act employs substantially the same language as the relevant portions of the FCA, *see* N.J. Stat. Ann. § 2A:32C-3(a), (b), (c), and (g). The state statute has been interpreted in line with its federal counterpart. *See United States v. Loving Care Agency, Inc.*, 226 F. Supp. 3d 357, 364 (D.N.J. 2016) ("The language in the NJFCA is nearly identical to the federal statute and thus requires the same showings").

Here, Plaintiffs allege that Defendants (1) violated sections 3729(a)(1)(A) and (B) of the FCA by making false statements to obtain grants or loans; (2) violated Section 3729(a)(1)(G) of the FCA by avoiding penalties under the Clean Water Act; (3) violated Section 3729(a)(1)(C) of the FCA by conspiring to commit violations of Section 3729(a)(1)(A), (B), and (G); and (4) violated the analogous provisions of the NJFCA in obtaining grants or loans, *see* N.J. Stat. Ann. § 2A:32C-3(a), (b), (c), and avoiding CWA penalties, *see* N.J. Stat. Ann. § 2A:32C-3(g). (*See* Op. to MTD at xi.) Defendants counter that Plaintiffs' claims under both the FCA and NJFCA (1) lack sufficient particularity; (2) fail to adequately allege falsity, causation, knowledge, and materiality; and therefore must be dismissed pursuant to Fed. R. Civ. Pro. 12(b)(6). (Port Imperial MTD at 5-12; Warren MTD at 6-24.)

I begin with Plaintiffs' parallel claims of "legal falsity" under Section 3729(a)(1)(A) and (B) of the FCA and Section 2A:32C-3(a) and (b) of the NJFCA. Legal falsity imports that a defendant knowingly and falsely certified that it had "complied with a statute or regulation, the compliance with which is a

11

condition for Government payment."[5] *Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). There are two theories of legal falsity under the FCA: express false certification and implied false certification. "Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *Ibid.* (citation omitted). Under the "implied false certification" theory, an entity is liable if it "seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *Ibid.* In line with the FCA's materiality requirement, a plaintiff "must show that compliance with the regulation which the defendant allegedly violated was a condition of payment from the Government" under either an express or implied false certification theory. *Id.* at 309.

Plaintiffs' claims of legal falsity under the FCA and NJFCA lack sufficient detail, especially regarding materiality, to survive a motion to dismiss. The claim is that Defendants made false express or implied representations of environmental compliance to obtain "loan and grant monies." In support, the complaint proffers a "non-exhaustive" chart listing the date, recipient, and dollar amount of funds received from FWHA, FEMA, and NJ Transit. (Am. Compl. ¶181-83.) The complaint does not specify the nature or purpose of these payments, or even really identify them as grants. It does not state with any specificity what information Defendants were required to disclose to obtain these payments, or the statutory or regulatory source of any such disclosure requirement. (*Ibid.*)

Plaintiffs attempt to remedy these omissions in their briefing. "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d

---

[5] A claim of factual falsity, as opposed to legal falsity, requires an allegation that the claimant misrepresented the goods or services that it provided to the Government. *Wilkins*, 659 F.3d at 305. No claim of factual falsity is made here.

173, 181 (3d Cir. 1988) (citation omitted). The claims of "legal falsity" under Section 3729(a)(1)(A) and (B) of the FCA and Section 2A:32C-3(a) and (b) of the NJFCA are therefore dismissed.

Plaintiffs' parallel claims under 31 U.S.C. § 3729(a)(1)(G) and N.J. Stat. Ann. § 2A:32C-3(g) fare no better. The theory seems to be that an alleged violation of the Clean Water Act creates "an obligation to pay or transmit money or property to the Government," which the Defendants failed to fulfill. *See* 31 U.S.C. § 3729(a)(1)(G). Without addressing the merits of the underlying Clean Water Act claim (as I do below), I find that Plaintiffs are here mistaken as a matter of law. "The FCA defines 'obligation' as 'an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Petras*, 857 F.3d at 504–05 (quoting 31 U.S.C. § 3729(b)(3)). In reviewing the legislative history of the FCA in *Petras*, the Third Circuit noted that this language was explicitly adopted to prevent relators from pursuing "speculative FCA claims" that sought "to enforce fines before the Government had formally established the duty to pay them." *Id.* at 305 (internal quotation marks omitted). Otherwise, "if a corporation had falsely claimed compliance with a regulation, a relator could then bring a [suit under 31 U.S.C. § 3729(a)(1)(G)] based on this conduct and assert that the corporation was improperly avoiding an obligation to pay discretionary fines that the Government might levy for this conduct." *Ibid.*

Plaintiffs' claim under Section 3729(a)(1)(G) is precisely the kind of speculative FCA claim disapproved in *Petras*. Civil penalties that are contingent on proof of a regulatory violation under the CWA do not constitute a presently existing "obligation" to the federal government within the meaning of the FCA. *See id.* at 506-07, 507 n.51; *see also United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1041 (5th Cir. 2016) ("[P]enalties under the CWA are mandatory only in the sense that *once a violation has been*

*established*, some form of penalty is required." (emphasis in original) (internal quotation marks and citation omitted)). In short, a plaintiff cannot identify what it believes to be a violation, posit that a civil penalty would be owed if it were pursued and proven, and bring a False Claims Act claim based on the defendant's failure to preemptively pay that hypothetical penalty.

Finally, as all of Plaintiffs' other claims under the FCA and NJFCA are dismissed, so too are their claims for conspiracy under those statutes. Conspiracy, in this civil context, is a means of spreading liability among multiple participants; it presupposes an underlying liability. *See Petratos*, 141 F. Supp. at 317 n.3 ("Without an underlying violation, there can be no liability for conspiracy under the FCA."); *see also Petras*, 857 F.3d at 507 n.53 ("[T]here can be no liability for conspiracy where there is no underlying violation of the FCA." (quotations and citation omitted)).

Accordingly, I will grant the motions to dismiss Counts 1 through 4 of Plaintiffs' first amended complaint without prejudice.

### C. Alleged Retaliation under the False Claims Act (Count 8)

Regarding retaliation, the FCA provides for a private cause of action, as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). To establish a claim for retaliation under Section 3730(h), a relator must show that "(1) he engaged in protected conduct, (i.e., acts done in furtherance of an action under § 3730)"; and "(2) that he was discriminated against because of his protected conduct." *U.S. ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d 103, 110–11 (3d Cir.

2007) (internal citations omitted); *see DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018).

To satisfy the first, "protected conduct" requirement, "the case law . . . requires a nexus with the in furtherance of prong of [a False Claims Act] action," which "involves determining whether [plaintiff's] actions sufficiently furthered an action filed or to be filed under the [False Claims Act]." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 187 (3d Cir. 2001) (alterations in original; internal citation and quotation marks omitted). "Protected conduct" includes "investigation for, initiating of, testimony for, or assistance in" an FCA suit. *Id.*; 31 U.S.C. § 3730(h)(1). It also encompasses internal reports of FCA violations. *Hutchins*, 253 F.3d at 187. Protected activity does not, however, include "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations." *Id.* at 187-88 (quoting *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998)).

The second, retaliation prong requires a causation nexus, *i.e.,* that employees "were discriminated against 'because of' their 'protected conduct.'" *Hutchins*, 253 F.3d at 188; *see also DiFiore*, 879 F.3d at 78 (holding that FCA requires "proof of 'but-for' causation."). To demonstrate discrimination "because of" activities in furtherance of an FCA suit, a plaintiff must demonstrate that "(1) his employer had knowledge he was engaged in protected conduct; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in protected conduct." *Hefner*, 495 F.3d at 111 (internal citation and quotation marks omitted). This causation element cannot be satisfied unless, at a minimum, the employee "put his employer on notice of the 'distinct possibility' of [FCA] litigation." *Ibid.* Such notice of a "distinct possibility" of FCA litigation "is essential because without knowledge an employee is contemplating a False Claims Act suit, 'there would be no basis to conclude that the employer harbored [§ 3730(h)'s] prohibited motivation, [i.e., retaliation].'" *Hutchins*, 253 F.3d at 188 (alteration in original) (quoting *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1314 (M.D. Ala. 1999)).

An employer may be on notice of a "distinct possibility" of litigation "when an employee takes actions revealing the intent to report or assist the government in the investigation of a [FCA] violation." *Id.* at 189; *see also id.* at 188 n.8 (noting that while "the 'protected conduct' and notice requirements are separate elements of a prima facie case of retaliation under § 3730 . . . the inquiry into these elements involves a similar analytical and factual investigation.").

Here, Plaintiffs contend that the termination of Khatchikian's employment with Port Imperial was retaliatory, "because he tried to stop his employer's illegal conduct." (Op. to MTD at 51-59.) Defendants respond that Plaintiffs fail to plead a plausible FCA retaliation claim. (Port Imperial MTD at 25-28; Warren MTD at 24-25.) For the reasons stated below, if find that this FCA claim of retaliation, like the other FCA claims, must be dismissed for failure to plead sufficient facts. The complaint does not plausibly allege that Khatchikian's actions constituted protected conduct under the FCA, or that Defendants terminated his employment because of such actions.

The FCA is not a generalized anti-retaliation law; a claim of retaliation must be predicated on acts that are "protected" *under the FCA*. Exposure of, *e.g.,* environmental violations, even if protected by other statutes, is not protected under the FCA. Khatchikian's conduct, as alleged here, appears to have been an investigation "of nothing more than his employer's non-compliance with federal or state regulations" regarding the environment; it is not behavior designed to "further[] an action filed or to be filed under the [False Claims Act]." *See Hutchins*, 253 F.3d at 187-88. If anything, Khatchikian's conduct appears to have been specifically focused on investigating CWA violations and furthering claims based on the environmental laws. He took photographs and videos of Defendants' ferries releasing pollutants, spoke with and identified multiple employees involved in such pollution, and developed an understanding of the day-to-day practices of pollution at Defendants' facilities. (*See e.g.*, Am. Compl. ¶¶ 2, 118, 150-56, 167-69, 204-06.) Detail regarding

alleged FCA violations are scant because, at least as reflected in Plaintiffs' first amended complaint, no effort was spent in developing any FCA claim as such. Without evidence of action taken in furtherance of an FCA claim, I cannot find that Khatchikian engaged in protected conduct within the meaning of 31 U.S.C. § 3730(h).

As for causation, there is a similar paucity of information regarding what notice, if any, was given to Defendants that they might be facing an FCA suit. As with his investigative efforts, Khatchikian's statements to Defendants pertained to their alleged violations of environmental laws, not to their efforts to obtain federal and state funds. (*See e.g.*, Am. Compl. ¶¶ 157, 184, 192, 200.) Nowhere does Plaintiffs' complaint allege that Khatchikian knew anything about Defendants' loans and grants, or the means by which they were obtained. Even now, most facts regarding such loans or grants are alleged only on information and belief, supplemented by post hoc investigation. Nor does the complaint indicate that Khatchikian ever said anything to his employers suggesting that he was considering an FCA claim. Under such circumstances, I cannot find that Defendants were "on notice of the 'distinct possibility' of [FCA] litigation." *Hutchins*, 253 F.3d at 188. And unless they were on notice of protected conduct, they cannot have retaliated based on protected conduct.

Accordingly, I will dismiss Count 8 of the first amended complaint without prejudice.

### D. The Clean Water Act (Count 6)

Defendants challenge Plaintiff's CWA claim primarily at the threshold stage of subject matter jurisdiction. Specifically, they argue that subject matter jurisdiction is lacking because (1) Plaintiffs did not provide notice to Defendants at least 60 days prior to filing suit, as required under the CWA; and (2) although only ongoing violations are redressable under the CWA, Plaintiffs only allege wholly past violations. In response, Plaintiffs allege that sufficient notice was, in fact, provided to Defendants, and argue that their First Amended Complaint sufficiently sets forth an ongoing violation of the CWA.

### 1. Timing of Pre-Suit Notice under the CWA

The CWA provides that a citizen may not commence an action "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order[.]" 33 USC § 1365(b)(1)(A) (pre-suit notification requirement). Fulfilling the pre-suit notification requirement is a "mandatory, not optional, condition precedent for suit." *Public Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir.1995) (quoting *Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989)).

Defendants allege that the CWA's pre-suit notification requirement is a jurisdictional rule and that, in failing to comply with it, Plaintiffs have deprived this Court of subject matter jurisdiction over Count Six. (Port Imperial MTD at 16-20; Warren MTD at 25-26.) Supreme Court precedent on the subject has avoided resolving the issue of whether the notice requirement is jurisdictional. *Hallstrom*, 493 U.S. at 31 ("In light of our literal interpretation of the statutory requirement, we need not determine whether [the notice and 60-day delay requirement] is jurisdictional in the strict sense of the term."). The U.S. Court of Appeals for the Third Circuit, however, has categorized the pre-suit notification requirement as a "jurisdictional prerequisite." *Pub. Interest Research Group v. Windall*, 51 F.3d 1179, 1189 n.15 (3d Cir. 1995). Bound to treat this requirement as a "jurisdictional prerequisite," I will assess this portion of Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) (lack of subject-matter jurisdiction) rather than 12(b)(6) (failure to state claim upon which relief can be granted).

The court has "an independent obligation to determine whether subject-matter jurisdiction exists," *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), and without such jurisdiction, I "cannot proceed at all in any cause," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

> The burden of establishing federal jurisdiction rests with the party asserting its existence. [citing *DaimlerChrysler Corp. v. Cuno*, 547

U.S. 332, 342 n.3, 126 S. Ct. 1854, 164 L.Ed.2d 589 (2006).]
"Challenges to subject matter jurisdiction under Rule 12(b)(1) may
be facial or factual." [citing *Common Cause of Pa. v. Pennsylvania*,
558 F.3d 249, 257 (3d Cir. 2009) (quoting *Taliaferro v. Darby Twp.
Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006)).] A facial attack
"concerns 'an alleged pleading deficiency' whereas a factual attack
concerns 'the actual failure of [a plaintiff's] claims to comport
[factually] with the jurisdictional prerequisites.' " [citing *CNA v.
United States*, 535 F.3d 132, 139 (3d Cir. 2008) (alterations in
original) (quoting *United States ex rel. Atkinson v. Pa. Shipbuilding
Co.*, 473 F.3d 506, 514 (3d Cir.2007)).]

> "In reviewing a facial attack, the court must only consider
> the allegations of the complaint and documents referenced therein
> and attached thereto, in the light most favorable to the plaintiff."
> [citing *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir.
> 2000).] By contrast, in reviewing a factual attack, "the court must
> permit the plaintiff to respond with rebuttal evidence in support of
> jurisdiction, and the court then decides the jurisdictional issue by
> weighing the evidence. If there is a dispute of a material fact, the
> court must conduct a plenary hearing on the contested issues
> prior to determining jurisdiction." [citing *McCann v. Newman
> Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006) (citations
> omitted).]

*Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (footnotes
omitted; case citations in footnotes inserted in [bracketed] text).

The parties dispute factually whether Plaintiffs complied with the CWA's
pre-suit notice requirement. While Defendants maintain that both the content
and timing of Plaintiff's notice were deficient, Plaintiffs allege that notice was
properly given, and in support set out a timeline of their contacts with
Defendants. Plaintiffs claim that Port Imperial first received a letter including a
"draft complaint outlining [Port Imperial]'s illegal discharge of sewage and
threatening to file a wrongful termination action" at some point "[i]n late 2015 or
early 2016." (Op. to MTD at 43.) Plaintiffs' original complaint was filed under seal
on April 28, 2016, and was served on the Department of Justice ("DOJ"), U.S.
Attorney's Office for New Jersey ("USAO"), and New Jersey Attorney General's office
("NJAG"). (*Id.* at 43.) On September 17, 2018, Plaintiffs sent Port Imperial a
letter—copying the DOJ and environmental protection agencies for the federal
government, New Jersey, New York—"explicitly outlin[ing] the intention to serve a

complaint" against Port Imperial, Billybey, and "various individuals alleging violations of the CWA arising from routine improper disposal of 'sullage,' and 'oil filters, waste oil bilge fluids and engine compartment fluids at the Weehawken work dock location.'" (*Id.* at 43-44; *see also* Am. Compl. ¶ 211.) On December 10, 2018, the USAO informed defendants of the original complaint. (Op. to MTD at 44.) Finally, Plaintiffs filed their amended complaint under seal on November 17, 2020, again served the DOJ, USAO, and NJAG, and then served Defendants once the case was unsealed on December 4, 2020. (*Id.* at 44.)

Although the briefs and record before me are less than clear, it does emerge that Plaintiffs' letters from "late 2015 or early 2016" and September 2018 are of central importance. Plaintiffs cite those letters in contending that they provided the requisite notice more than sixty days in advance of the filing of their first amended complaint. Defendants make no mention of the first letter; they state, with little explanation, that the second was "vague and fails on many points"; and they conclude that "no Defendant received any information whatsoever" regarding Plaintiffs' claims. (Port Imperial MTD at 20.)

This, then, will be considered not as a facial attack on jurisdiction but one which requires the court to consider facts extrinsic to the complaint. Where "subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own." *Arbaugh*, 546 U.S. at 514; *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction . . . the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.").[6] And in order to create the necessary evidentiary record, the Court is authorized to order targeted

---

[6]     Despite Defendants' assertions to the contrary (Port Imperial MTD Reply at 10-11), it is neither improper nor unusual for this Court to consider evidence outside the complaint when determining whether subject matter jurisdiction exists, or—as in the case at bar—if a factual dispute over subject matter jurisdiction exists, *see e.g. Gould Elecs. Inc. v. United States*, 220 F.3d 169, 177 (3d Cir. 2000) ("By treating the motion as a factual attack, the District Court properly considered evidence beyond the pleadings.") *See also Lincoln Ben. Life Co.,* quoted at pp. 20–21, *supra.*

jurisdictional discovery. *See Lincoln Ben. Life*, 800 F.3d at 108 ("District courts have the authority to allow discovery in order to determine whether subject-matter jurisdiction exists.").

Therefore, to resolve this dispute, I will order limited discovery on the issue of subject matter jurisdiction—specifically, evidence regarding the timing and content of the communications with Defendants which, in Plaintiffs' view, satisfy the 60-day pre-suit notice requirement under the CWA. Accordingly, I deny Defendants' motion to dismiss Count 6 of Plaintiffs' amended complaint without prejudice to its renewal after jurisdictional discovery, under the supervision of the Magistrate Judge assigned to this case.[7]

### 2. Alleging a Current Violation of the CWA

I next discuss the Defendants' alternative contention that the complaint fails to allege a violation of the CWA that is current. This requirement, too, has been treated as one of jurisdictional stature.

The CWA authorizes a citizen suit against any person "who is alleged to be in violation . . ." of that statute. 33 U.S.C. § 1365(a)(1). The Supreme Court has stated that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield v. Chesapeake Bay*

---

[7]      In their motion to dismiss, Defendants suggest that Plaintiffs' notice was also deficient for failing to provide sufficiently precise information regarding Defendants' alleged CWA violations. (Port Imperial MTD at 20.) Although "the content of the notice must be adequate for the recipients of the notice to identify the basis for the citizen's complaint," *Hercules*, 50 F.3d at 1249, there is no requirement that a plaintiff artfully allege every detail of compliance with the pre-suit notice requirement contained within EPA regulations. *See, e.g.,* 40 CFR 135.2(a)(1) (detailing requirements for service of notice on a corporation or individual); 40 CFR 135.3(a) (detailing requirements for the contents of such notice). Moreover, the Third Circuit has explicitly declined to treat the requisite specificity of notice for a CWA claim, governed by EPA regulations, as being the same kind of "mandatory condition[] precedent" as the pre-suit notification requirement itself. *Hercules*, 50 F.3d at 1249. Accordingly, I decline Defendants' invitation to dismiss Plaintiffs' CWA claim on this narrow ground at this early stage of litigation.

*Found.*, 484 U.S. 49, 57 (1987). The Court held that there is "jurisdiction over citizen suits when the citizen-plaintiff makes a good-faith allegation of [a] continuous or intermittent violation." *Id.* at 64.

Thus, all that is required for jurisdictional purposes is a good-faith allegation of a violation that is current. *See Gwaltney*, 484 U.S. at 64-65; *Sierra Club v. Union Oil Co. of California*, 853 F.2d 667, 669 (9th Cir.1988); *PennEnvironment v. PPG Indus.*, 964 F.Supp.2d 429, 467-68 (W.D. Pa. 2013). A violation is considered current, or ongoing, when prior discharges have not been remediated, and the pollutant remains on the property or in the water. *See Raritan Baykeeper, Inc. v. NL Indus.*, 2013 WL 103880 at *20 (D.N.J. Jan. 8, 2013) ("The contaminants from NL's discharges constitute a continuing violation because they remain in the river and the river sediments have not been remediated." (citing *Gwaltney*, 484 U.S. at 69 (Scalia, J., concurring))); *see also PennEnvironment*, 964 F.Supp.2d at 470–71 (denying motion to dismiss CWA claims and noting that the arguments are more appropriate for a motion for summary judgment).

Because this portion of the motion is directed at the Court's subject matter jurisdiction, it is properly considered as a motion under Fed. R. Civ. P. 12(b)(1). Little turns on the distinction, because the issue is not factual, but facial, and therefore subject to the equivalent of a Rule 12(b)(6) standard. *See Lincoln Ben. Life, supra.* I find that Plaintiffs have alleged ongoing CWA violations sufficient to meet the jurisdictional threshold. *See Gwaltney*, 484 U.S. at 64-65. The complaint alleges myriad instances of Defendants or their employees illegally discharging raw sewage, fuel, chemicals, and boat parts into nearby waterways. Plaintiffs claim that these acts took place over a period of years and are common, even routine, practices. (*See, e.g.*, Am. Compl. ¶¶ 133, 146-47, 150-51, 167-69, 171-77.) The parties' briefs reveal no allegation that these practices ever ceased, that such pollution was ever remediated, or that such pollution no longer remains in local bodies of water such as the Hudson River or Raritan Bay. *See Raritan Baykeeper, Inc.*, 2013 WL 103880 at *20. "A

good or lucky day is not a state of compliance. Nor is the dubious state in which a past effluent problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated." 484 U.S. at 69 (Scalia, J., concurring).

Assuming subject matter jurisdiction is not otherwise flawed, *see* Section D.1., *supra*, I will not dismiss Count 6 of the amended complaint on grounds of failure to allege a current violation of the CWA.

### E. NJRICO (Count 7)

Pursuant to NJRICO, it is unlawful to be "employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." N.J. Stat. Ann. § 2C:41–2(c). The elements of a claim under NJRICO are "(1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy." *Galicki v. New Jersey*, 2015 WL 3970297, at *7 (D.N.J. June 29, 2015). To show a pattern of racketeering activity, a plaintiff must plead "at least two predicate acts" of racketeering activity. *Grant v. Turner*, 505 F. App'x 107, 111 (3d Cir. 2012); *see also In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 245-246 (3d Cir. 2012) (noting that NJRICO and its federal counterpart "parallel each other" and "are intended to be coextensive").

I start with the allegation that Defendants "engaged in a 'pattern of racketeering activity'" as defined by statute. (*See* Am. Compl. ¶¶ 282-85.) Plaintiffs' brief and the Amended Complaint allege that the "pattern of racketeering activity" consisted of the FCA retaliation and CWA violations. (Am. Compl. ¶¶ 33-40, 268-88.)

First, the retaliation claim, as stated above, is not adequately pled. Therefore it cannot furnish the basis of an NJRICO claim, either.

Second, neither environmental laws, nor the CWA in particular, are listed as predicate racketeering acts in the NJRICO statute. NJRICO defines "racketeering activity" to include numerous listed crimes—such as murder, kidnapping, extortion, drug distribution, and fraud—but makes no mention of environmental violations. N.J. Stat. Ann. § 2C:41-1(a); *see also* 18 U.S.C. § 1961(1) (defining racketeering activity similarly for federal RICO).

In short, this complaint does little more than set forth the legal elements of NJRICO. Its factual allegations fall short of what is required by *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Accordingly, I dismiss Count 7 without prejudice.

## III.  CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted as to Counts 1, 2, 3, 4, 7, and 8 of the first amended complaint. As to Count 6, the motion to dismiss is denied without prejudice to renewal following jurisdictional discovery.

A separate order will issue.

Dated: October 7, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**