## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA AND STATE OF NEW JERSEY EX REL. RAFI KHATCHIKIAN AND IVAN TORRES**<br><br>   **Plaintiffs/Relators,**<br><br> **v.**<br><br>**PORT IMPERIAL FERRY CORPORATION, et al.,**<br><br>   **Defendants.** | Civ. No. 2:16-2388 (KM) (AME)<br><br>**OPINION** |

### KEVIN MCNULTY, U.S.D.J.:

Plaintiffs Rafi Khatchikian and Ivan Torres were previously employed by Defendant Port Imperial Ferry Corporation d/b/a NY Waterway ("Port Imperial"), which operates a fleet of commercial ferries and multiple boat maintenance facilities. Plaintiffs, suing as relators under the Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("CWA"), claim that Port Imperial violated federal environmental laws by routinely dumping raw sewage, boat fuel, oil, and other materials into New Jersey's and New York's waterways, and that they were essentially fired in retaliation for objecting to it.

Now before the Court is Port Imperial's renewed motion to dismiss Count 6 of the Amended Complaint, which contains Plaintiffs' remaining CWA claims. For the following reasons, Port Imperial's motion is **GRANTED**.

To be clear, this dismissal and its predecessor (DE 38, 39) do not operate as an approval of the dumping practices alleged. Rather, they largely reflect jurisdictional and other legal defects, as well as bars to the assertion of these environmental violations in the guise of private causes of action on behalf of employees.

## I.    BACKGROUND

### A. Factual Allegations[1]

Port Imperial is a Weehawken-based corporation that operates over thirty ferry vessels in multiple major waterways in New Jersey and New York, including the Hudson River, East River, New York Bay, and Raritan Bay. (Compl. ¶¶ 1, 13, 105.)[2] Its president and founder is Arthur Imperatore Sr. and its vice president is Alan Warren. (*Id.* ¶¶ 14, 15.) Beginning in 2004, Port Imperial's fleet was partially owned by Billybey Ferry Company, LLC, a New Jersey company formed by William Wachtel to take over debt payments of approximately sixteen Port Imperial ferries. (*Id.* ¶¶ 16-18, 112.) Port Imperial continued to operate and maintain those sixteen ferries and ultimately acquired Billybey's assets in 2016.[3] (*Id.* ¶¶ 112-13.)

Port Imperial also operates a ferry passenger terminal and two maintenance docks: a larger one ("the work dock") that provides maintenance, repairs, and refueling, and a smaller one ("the secondary dock") that provides

---

[1]    In this section, I set forth only the factual allegations that pertain specifically to Plaintiffs' CWA claims, as they are the only live claims that remain in the case. A fuller summary of the facts alleged in the Amended Complaint can be found in Section II of my October 7, 2021 Opinion. (DE 38.)

[2]    Certain citations to the record are abbreviated as follows:

> "DE" = Docket entry number in this case
>
> "Compl." = Plaintiffs' First Amended Complaint and Demand for Jury Trial (DE 10)
>
> "First MTD Op." = October 7, 2021 Opinion granting in part Defendants' motions to dismiss (DE 38)
>
> "Mot." = Brief in Support of Defendants' Renewed Motion to Dismiss Count Six (DE 62-1)
>
> "Opp." = Plaintiffs' Memorandum in Opposition to Port Imperial Ferry Corporation's Motion to Dismiss Count Six of the First Amended Complaint (DE 69)

[3]    As part of this 2016 acquisition, Port Imperial entered into a leaseback agreement with Billybey, which provided that Billybey would collect revenue from two ferries while Port Imperial operated and maintained them. (Compl. ¶ 114.)

refueling and "light maintenance" for Port Imperial's "premier" vessels. (*Id.* ¶¶ 13, 107, 110-11.) The work dock is located in Weehawken and sits on "water land" belonging to Romulus, another company owned by Imperatore. (*Id.* ¶¶ 13, 16, 109.)

Plaintiffs Khatchikian and Torres were both employed by Port Imperial at its maintenance docks until 2015. Khatchikian worked as a fueler from 2013 to 2015, while Torres worked as a fueler and mechanic from 2011 to 2015. (*Id.* ¶¶ 11, 12, 120-22, 124-25.) As detailed below, both allege that they witnessed Port Imperial's employees routinely dumping sewage, garbage, oil, fuel, and other pollutants into the Hudson River and other waterways in which Port Imperial's ferries operated. (*Id.* ¶ 3.) Indeed, they themselves were instructed to dump these pollutants as part of their employment and were "expected to individually take the blame" if authorities ever discovered it. (*Id.* ¶¶ 34, 37, 116, 150-51, 153.)

Ultimately, Khatchikian alleges, his employment was terminated after he notified supervisors and union management that available equipment was insufficient to properly dispose of raw sewage and that their method of disposing of vessels' sewage was illegal. (*Id.* ¶¶ 34, 141, 157-59.) Torres alleges that he was "compelled to terminate" his own employment after complaining about the pollution. (*Id.* ¶¶ 37, 160.)

Both before and after his termination, Khatchikian sought to observe and document Defendants' pollution. His observations, photographs, and videos constitute part of the factual basis of the complaint, summarized in the following sections.

### 1. Illegal Discharge of Sewage

One of the duties of a fueler was to dispose of sewage from vessels. Both Khatchikian and Torres believed that the "proper" way to dispose of sewage was to connect vessels to an intake hose that emptied into the municipal sewage system. (Compl. ¶¶ 127, 129-32.)

3

Port Imperial, however, allegedly had multiple routine practices for illegally dumping pollutants. First, dock workers would use either a stationary or portable pump to empty vessels' sewage directly into the Hudson River. (*Id.* ¶¶ 146-47, 150-51.) Second, some ferries were equipped with on-board pumps that would be used to pump out sewage when the ferries were in open water or when docked. (*Id.* ¶ 148.) Third, some ferries were equipped with a pipe under the vessel leading to the sewage holding tank that crewmembers would open while the ferry was in motion, allowing gravity and suction to empty sewage directly into the water. (*Id.* ¶¶ 117, 149.) Moreover, dock workers would also put the chemical "Aqua Kem" into the ferries' sewage tanks to reduce the odor of sewage when it was discharged, and they would run vessels' propellers to disperse the sewage once it was released into the waters of the Hudson. (*Id.* ¶¶ 144, 171-72.)

All told, this practice of pollution was allegedly a "nightly" routine at Port Imperial's work dock, and it also occurred, though "not as common[ly,]" at Port Imperial's secondary maintenance dock.[4] (*Id.* ¶ 133.) Given the size of vessels' sewage holding tanks and the frequency of illegal dumping of sewage, Plaintiffs estimate that Port Imperial "could easily discharge over 2,000 gallons of raw sewage from 20 vessels directly into the Hudson River in a single day." (*Id.* ¶ 156.)

Plaintiffs allege that these illegal methods of dumping sewage were dictated by their supervisors and that Port Imperial was aware of these practices. (*Id.* ¶¶ 150-51, 153-54.) Plaintiffs allege that Port Imperial Vice President Alan Warren personally instructed Torres to illegally dump sewage into the Hudson River, stating "the Coast Guard isn't around, so just do what you gotta do." (*Id.* ¶ 162.) Indeed, Khatchikian states that on one occasion, he

---

[4]     Plaintiffs' complaint also alleges that sewage was "sometimes" dumped at Port Imperial's passenger terminal when ferry vessels were moored there overnight. (Compl. ¶ 147.)

saw Warren watching the illegal discharge of sewage in the Hudson River. (*Id.* ¶ 162.)

In further support of these allegations, Plaintiffs provide numerous photographs that depict various Port Imperial vessels pumping brown-colored liquid into nearby waters. (*Id.* ¶¶ 2, 150, 155.) Plaintiffs provide a non-exhaustive list of individual ferries allegedly involved in such pollution. (*See id.* ¶¶ 115-17, 119, 168.) Khatchikian also alleges that in October 2018, partially in response to information provided by Plaintiffs, the Environmental Protection Agency placed fluorescent dye into the sewage holding tank of a Port Imperial vessel, as a test. (*Id.* ¶ 207.) The following day, Khatchikian observed Port Imperial employees discharging sewage into the Hudson River, as evidenced by fluorescent dye in the river water, and then using the boat's propeller to disperse the dyed sewage. (*Id.* ¶ 208.)

## 2. Illegal Discharge of Polluted Bilge Water

Khatchikian and Torres maintain that they witnessed multiple Port Imperial ferries "routinely" discharge bilge water that was polluted with "oil, fuel, lubricants, and coolant" directly into the Hudson River. (Compl. ¶¶ 167, 169.) To conceal the pollution in discharged bilge water, Port Imperial mechanics allegedly would mix bilge water with liquid detergent before discharging it, and then run a vessel's propellers to churn and disperse the water. (*Id.* ¶¶ 167-69, 171.) Plaintiffs name the individual ferries involved in such pollution and provide first names or initials for mechanics said to have participated in these practices. (*See id.* ¶¶ 118, 168.) Additionally, Khatchikian states that after he left Port Imperial's employ, he observed the discharge of oil and other pollutants from Port Imperial vessels into the Hudson River on at least three separate occasions: June 25, June 27, and September 23, 2018. (*Id.* ¶¶ 204-06.)

## 3. Other Alleged Violations of Environmental Laws

Plaintiffs also allege, albeit more briefly, that Port Imperial illegally discharged other pollutants into nearby waterways, improperly disposed of

ship-related refuse, and tried to conceal their violations of environmental law from both government authorities and the public.

First, they allege that Port Imperial's vessels dumped "hundreds of gallons of coolant" into the waterways. (Compl. ¶ 173.) They claim that when vessels were damaged—a "common and ordinary occurrence"—and leaking coolant, Port Imperial would ask mechanics and fuelers, including Plaintiffs, to regularly replenish the coolant but would avoid getting the leaks repaired until they were informed of an impending Coast Guard inspection. (*Id.* ¶¶ 174-77.)

Second, they state that Torres witnessed Port Imperial employees routinely polluting the Hudson River with used batteries and aluminum shavings while repairing Port Imperial's vessels at both maintenance docks. (*Id.* ¶¶ 178-80.) No further detail is given.

Third, Plaintiffs maintain that Port Imperial "failed to follow proper disposal procedures" for oil filters and fuel filters. (*Id.* ¶ 165.) In support of this claim, they provide a photograph dated March 14, 2015, that purportedly depicts used oil filters in a dumpster. (*Ibid.*)

Finally, Plaintiffs state that Port Imperial aimed to hide their environmental violations, for instance by concealing oil and fuel filters that they improperly disposed of in black plastic garbage bags. (*Id.* ¶ 3.) In another instance, Khatchikian claims that he accidentally caused a fuel spill of "somewhere between 300 and 350 gallons of fuel" into the Hudson River and notified Warren, who told him that "if anybody asks," he should report that the spill was between 30 and 60 gallons. (*Id.* ¶¶ 170, 185-86.)

### B. Procedural History

Plaintiffs commenced this action on April 28, 2016. (DE 1.) On November 17, 2020, Plaintiffs filed their operative Amended Complaint alleging that Port Imperial, along with Arthur Imperatore, Alan Warren, Romulus Development Corp. ("Romulus"), Billybey Ferry Company, LLC ("Billybey"), and William

Wachtel[5] (collectively, the "Defendants") 1) violated and conspired to violate the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* (Counts 1 and 2); 2) violated and conspired to violate the New Jersey False Claims Act ("NJFCA"), N.J. Stat. Ann. § 2A:32C-1 *et seq.* (Counts 3 and 4); 3) violated the CWA, formally referred to as the Federal Water Pollution Prevention and Control Act, 33 U.S.C. § 1251 *et seq.* (Count 6); and 4) violated the New Jersey Racketeer Influenced and Corrupt Organizations Act ("NJRICO"), N.J. Stat. Ann. § 2C:41-1 *et seq.* (Count 7) (Compl. ¶¶ 220-51, 261-88.) Additionally, Plaintiffs claimed that Port Imperial retaliated against Khatchikian in violation of the FCA, 31 U.S.C. § 3730(h) (Count 8).[6] (Compl. ¶¶ 289-94.)

On April 2, 2021, Port Imperial, Arthur Imperatore, Romulus, and Billbey filed a motion to dismiss Plaintiffs' amended complaint, arguing that 1) Plaintiffs failed to state claims under the FCA, NJFCA, and NJRICO, or for retaliation; 2) Plaintiffs failed "to allege liability on behalf of the individual defendants"; and 3) this Court lacks subject matter jurisdiction over Plaintiffs' CWA claims. (DE 19.) Alan Warren filed a separate motion to dismiss on May 23, 2021, similarly arguing that Plaintiffs failed to state viable, plausible claims in their complaint. (DE 27, 28.) On October 7, 2021, I granted the motions in part, dismissing Counts 1, 2, 3, 4, 7, and 8. (DE 38) As to Plaintiffs' remaining CWA claims (Count 6), I denied the motions to dismiss without prejudice to renewal following jurisdictional discovery on the issue of subject matter jurisdiction—specifically, evidence regarding the timing and content of Plaintiffs' purported communications with the Defendants which, in Plaintiffs' view, satisfy the 60-day pre-suit notice requirement under the CWA.

---

[5]     It is apparent from the docket that despite being added as a named defendant, William Wachtel has not appeared or otherwise participated in this case to date. In fact, it is unclear whether he was ever served. I understand Plaintiffs to have abandoned their claims against Mr. Wachtel individually.

[6]     In Count 5 of their Amended Complaint, Plaintiffs also alleged that defendants violated the federal Act to Prevent Pollution from Ships, 33 U.S.C. § 1901 *et seq.*, and retaliated against Khatchikian in violation of the NJFCA. (Compl. ¶¶ 252-60, 295-300.) However, Plaintiffs withdrew those claims on July 16, 2021. (DE 33.)

Jurisdictional discovery closed on June 27, 2022. (DE 59.) On July 29, 2022, the same group of Defendants renewed their motions to dismiss, with Alan Warren again moving separately, asserting that the Court lacks subject matter jurisdiction over Plaintiffs' remaining CWA claims because Plaintiffs failed to comply with that statute's pre-suit notice requirement. (DE 61; DE 62.) On September 27, 2022, Plaintiffs filed a brief in opposition to the renewed motions. (DE 69.) On November 8, 2022, the moving Defendants filed reply briefs. (DE 74; DE 75.) On February 9, 2023, Plaintiffs voluntarily dismissed their claims against defendants Alan Warren, Arthur Imperatore, Romulus, and Billybey. That dismissal rendered Warren's motion (DE 63) moot, and left Port Imperial as the only remaining defendant with a motion pending (DE 62).

Port Imperial's renewed motion to dismiss Count 6 of the amended complaint, now fully briefed and ripe for decision, is the subject of this opinion.

## II.   LEGAL STANDARD

Federal courts, as courts of limited jurisdiction, have an obligation to establish subject matter jurisdiction, raising it *sua sponte* if necessary *See Liberty Mut. Ins. Co. v. Ward Trucking Co.*, 48 F.3d 742, 750 (3d Cir. 1995). If a court determines at any time that it lacks subject matter jurisdiction, it must dismiss the action because subject matter jurisdiction "calls into question the very legitimacy of a court's adjudicatory authority." *See Council Tree Commc'ns., Inc. v. FCC*, 503 F.3d 284, 292 (3d Cir. 2007).

A motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) may be brought as a facial or factual challenge. *See Church of the Universal Bhd. v. Farmington Twp. Supervisors*, 296 F. App'x 285, 288 (3d Cir. 2008). Where the motion challenges jurisdiction on the face of the complaint, the court only considers the allegations of the complaint and documents referred to therein in the light most favorable to the plaintiff. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). The standard of review in a facial challenge is treated like a Rule 12(b)(6) motion to dismiss, in

that the court must assume that the complaint's well-pleaded factual allegations are true. *See Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).

By contrast, where the existence of subject matter jurisdiction is challenged factually, "no presumptive truthfulness attaches to the plaintiff's allegations," and the court may consider evidence outside the pleadings to satisfy itself of its power to hear the case. *Id.* Thus "Rule 12(b)(1) does not provide plaintiffs the procedural safeguards of Rule 12(b)(6), such as assuming the truth of the plaintiff's allegations." *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008).

## III.   DISCUSSION

Port Imperial previously moved to dismiss Plaintiffs' CWA claims for lack of subject matter jurisdiction, arguing that 1) Plaintiffs did not comply with the CWA's 60-day pre-suit notification requirement, and 2) Plaintiffs allege past violations whereas only ongoing violations are redressable under the CWA. In my October 7, 2021 Opinion, I ruled that Plaintiffs had alleged ongoing violations of the CWA, but that their compliance with the CWA's pre-suit notice provision remained an open question. (MTD Op. at 17-23.) To resolve this lingering issue, I ordered limited jurisdictional discovery to determine whether Plaintiffs did, in fact, satisfy this jurisdictional prerequisite.[7] The record, as it

---

[7]   Plaintiffs reassert their prior argument that the CWA notice provision is not jurisdictional and "ask the Court to reconsider its earlier ruling to the contrary." (Opp. at 7.) I decline their invitation to do so. I noted in my previous Opinion that the Third Circuit has explicitly categorized the CWA's pre-suit notification requirement as a "jurisdictional prerequisite." (MTD Op. at 18 (citing *Pub. Interest Research Group v. Windall*, 51 F.3d 1179, 1189 n.15 (3d Cir. 1995)). Less than a year after I issued that Opinion, the Third Circuit addressed this very issue in *Shark River Cleanup Coalition v. Township of Wall*, 47 F.4th 126 (3d Cir. 2022). There, the Third Circuit reiterated its previous characterization of the notice provision as jurisdictional but noted the possibility that such notice may be better characterized as "quasi-jurisdictional." *Id.* at 133 n. 10. Nevertheless, the Court opined that "[a]dequacy of notice is a legal question even if it is not strictly jurisdictional." *Id.* (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling, Corp.*, 629 F.3d 387, 400 (4th Cir. 2011) (describing sufficiency of notice as a "legal defense")). Equipped with this guidance from the Third Circuit, I will proceed in accordance with my earlier ruling, with the caveat that even if the CWA's notice requirement is not *strictly* jurisdictional, inadequate notice still requires

has been developed, indicates that Plaintiffs *did not* comply with the CWA's 60-day pre-suit notification requirement. As a result, this Court lacks subject matter jurisdiction over Plaintiffs' CWA claims, which therefore must be dismissed.

The CWA provides that a citizen may not commence an action "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of the Environmental Protection Agency], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator[.]" 33 USC § 1365(b)(1)(A). Fulfilling the pre-suit notification requirement is a "mandatory, not optional, condition precedent for suit." *Public Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995) (quoting *Hallstrom v. Tillamook County*, 493 U.S. 20, 26 (1989)).

Plaintiffs commenced the present action when they filed their initial complaint on April 28, 2016. *See* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court.").[8] In order to comply with the CWA's 60-day notice provision, then, Plaintiffs would have to have provided Port Imperial and others notice of the alleged violations by February 28, 2016. Plaintiffs have failed to identify *any* correspondence with Port Imperial, the EPA, or any other defendant or government agency regarding the alleged CWA violations prior to that date.[9] That failure alone warrants dismissal.

_____

dismissal. Even assuming that the Rule 12(b)(1) motion would need to be converted to one for summary judgment pursuant to Rule 12(d), no concerns of fair notice arise. I afforded the parties the opportunity for discovery on the issue, and they have presented the evidence they regard as pertinent.

[8]     District Courts around the country have regularly held that the rule regarding when an action is commenced is the same for CWA suits as it is for any other type of action. *See, e.g, Cal. Sportfishing Prot. All. v. USA Waste of Cal., Inc.*, No. 11-CV-2663, 2012 WL 2339810, at *4-5 (E.D. Cal. June 19, 2012) ("[a]n action alleging violations of the CWA is 'commenced' when the CWA claim appears in the complaint"); *Olympians for Pub. Accountability v. Port of Olympia*, No. C09-5756, 2011 WL 62147, at *3 (W.D. Wash. Jan. 7, 2011) (finding that a CWA action was "commenced" when it appeared for the first time in the amended complaint).

[9]     Indeed, the only cited relevant correspondence prior to the commencement of this action was a March 2016 exchange in which Mr. Khatchikian's prior counsel sent

Plaintiffs argue, contrary to the clear language of Fed. R. Civ. P. 3, that the present action was not "commenced" until it was "both filed *and served* on the Defendant." (Opp. at 11 (emphasis added).) This must be so, say Plaintiffs, because their pleading is a "hybrid complaint" that contains both CWA and FCA claims, and they could not provide CWA notice since the FCA required them to file their complaint under seal. (Opp. at 11.) Plaintiffs imply that when a plaintiff brings these two types of claims together, the FCA's secrecy requirement trumps the CWA's pre-suit notification requirement. Setting aside the fact that Plaintiffs provide no legal support for this proposition,[10] the argument is flawed for practical reasons. To the extent any conflict exists between Plaintiffs' obligations under the CWA and the FCA, this conflict was created by Plaintiffs themselves. Indeed, there is no reason Plaintiffs could not have sent Defendants notice of the alleged CWA violations even if they intended to later file their hybrid CWA/FCA complaint under seal. Moreover, Plaintiffs could easily have bifurcated their CWA and FCA claims, filing one complaint containing the FCA claims under seal and filing a second complaint containing the CWA claims on the public docket following the 60-day notice period.

---

Port Imperial an un-filed wrongful termination complaint that included "written allegations about [Port Imperial's] routine practice of discharging hundreds of gallons of human waste into the Hudson River." (Opp. at 2.) Threatening to bring an action for wrongful termination does not constitute adequate notice of intent to sue under the CWA, even if the communication was sent 60 days prior to filing.

[10]    Plaintiffs draw inspiration for their theory from the Second Circuit's decision in *Dague v. City of Burlington*, 935 F.2d 1344 (2d Cir. 1991), which involved a "hybrid complaint" that contained CWA claims brought in conjunction with claims under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a). However, *Dague*—a decision that is not binding on this Court in any event—is irrelevant to the present action. This is because the holding in *Dague* was limited to CWA suits that include allegations of hazardous waste violations brought under subchapter III of the RCRA, which are excepted from the RCRA's analogous 60-day waiting period. Because the purpose of this exception in the RCRA is to prevent delay in addressing emergent hazardous waste violations, the Court in *Dague* excused the CWA's 60-day delay requirement for this very specific situation. *Id.* at 1353-1354. The CWA/RCRA "hybrid" in *Dague* does not present an appropriate or even useful application to the combination of CWA and sealed FCA claims at issue here.

Finally, Plaintiffs' theory is untenable as it would allow any claimant to circumvent the CWA's 60-day pre-suit notification by tacking on an FCA claim to create a "hybrid complaint" that would have to remain secret while environmental violations remain ongoing. This would directly contravene the legislative purpose of the CWA's notice requirement, which is to "afford[] an opportunity for the alleged violator to bring itself into compliance with the CWA, or for the enforcer of first resort, the EPA, or the appropriate state agency, to institute an enforcement action." *City of Newburgh, v. Sarna*, 690 F. Supp. 2d 136, 147 (citing *Hallstrom v. Tillamook County*, 493 U.S. 20, 29 (1989); *see also Friend of Earth v. Laidlaw Envtl. Servs. Inc.,* 528 U.S. 167, 175-76 (2000) ("the purpose of the notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus … render unnecessary a citizen suit") (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (internal quotations omitted)). For these reasons, I decline to adopt the "hybrid complaint" exception to Fed. R. Civ. P. 3 that Plaintiffs propose.[11]

Because Plaintiffs failed to comply with the CWA's 60-day pre-suit notification requirement, this Court lacks subject matter jurisdiction over Plaintiffs' CWA claims, and what remains of the Amended Complaint must be dismissed.

---

[11]    Given that this action was in fact commenced in 2016, I decline to address certain October 2018 letters cited by Plaintiffs. Plaintiffs argue that these constituted adequate CWA notice, and that such notice was "augmented" by communications about the case between the U.S. Attorney's Office for the District of New Jersey and Defendants' counsel. (Opp. at 16-17; *see also* Mot. at 9-10.) But correspondence stating that an unnamed "client" intended to "file a complaint against [Port Imperial] after the statutory 60-day waiting period" does not provide adequate notice of a complaint that had been filed more than two years earlier. (*See* Mot. 4-5 (quoting one of Plaintiffs' October 2018 letters in full).)

## IV.  CONCLUSION

For the reasons set forth above, Port Imperial's motion to dismiss is **GRANTED**.

Because the parties have had the opportunity to take discovery, and it is clear that amendment would be futile, this dismissal will be entered with prejudice.

An appropriate order follows.

Dated: March 16, 2023

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**